**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED APRIL 23, 2003**

*In re* CERTIFIED QUESTION FROM
THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

KENNETH HENES SPECIAL PROJECTS
PROCUREMENT, MARKETING AND
CONSULTING CORPORATION,

    Plaintiff,

v                                        No. 120110

CONTINENTAL BIOMASS INDUSTRIES, INC.

    Defendant.

_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

    Plaintiff filed suit against Continental Biomass Industries, Inc., to recover unpaid sales commissions and penalty damages pursuant to the Michigan sales representative commission act (SRCA), MCL 600.2961. Pursuant to MCR 7.305(B),[1] the United States Court of Appeals for the Sixth

---

[1] MCR 7.305(B)(1) provides: "When a federal court . . . considers a question that Michigan law may resolve and that is
(continued...)

Circuit has certified the following question to this Court:

> What standard is appropriate in evaluating the mental state required for double damages under the Michigan Sales Representative Commission Act?

We have accepted the certification and hold that the plain language of the statute requires only that the principal purposefully fail to pay a commission when due. The statute does not require evidence of bad faith before double damages, as provided in the statute, may be imposed.

## I. FACTS AND PROCEEDINGS

Continental Biomass Industries (CBI) is a New Hampshire corporation that manufactures equipment used in wood waste processing. For several years, Kenneth Henes served as CBI's sales representative, with an exclusive sales territory that encompassed Michigan, Ohio, Indiana, Illinois, and Wisconsin.

After plaintiff's services were terminated in May 1998, he sought unpaid commissions on four sales. CBI refused to pay because it did not believe that plaintiff was entitled to the commissions under the terms of the contract.

The case was tried before a jury in federal court. The defendant requested a jury instruction regarding the level of intent required for the double-damages provision contained in the act. Specifically, defendant wanted the jury to be instructed that "[i]ntentional failure to pay means that defendant knew a commission was due the plaintiff and chose not to pay it."

---

[1](...continued)
not controlled by Michigan Supreme Court precedent, the court may on its own initiative or that of an interested party certify the question to the Michigan Supreme Court."

The trial court refused to give the requested jury instruction. Instead, the trial court followed the language of the statute, instructing the jury that if it found that a commission was owed, it must then decide if defendant intentionally failed to pay the commission when due.

On a special verdict form, the jury found that defendant owed all four commissions and that it intentionally failed to pay three of the four commissions when due.

Defendant filed a postjudgment motion for a new trial and amendment of the judgment. Defendant claimed that the jury instruction given by the trial court was insufficient because it did not define the term "intentionally" for the jury. The trial court denied the motion, stating that the SRCA was intended to be compensatory and not punitive.[2]

While defendant's appeal was pending in the United States Court of Appeals for the Sixth Circuit, this Court released *Frank W Lynch & Co v Flex Technologies, Inc*, 463 Mich 578; 624 NW2d 180 (2001). In *Lynch*, which addressed the retroactivity of the SRCA, the opinion stated that "the SRCA clearly serves a punitive and deterrent purpose," *id.* at 586, and that the act was "indisputably punitive, not compensatory." *Id*. at n 4. These statements arguably conflict with the trial court's conclusion regarding the nature of the statute.

The Sixth Circuit heard oral argument in the present case in August 2001. In the certified question request, the panel observed that the *Lynch* opinion did not indicate "what

---

[2] In making this ruling, the trial court relied on *M & C Corp v Erwin Behr GmbH & Co, KG*, 87 F3d 844 (CA 6, 1996).

3

specific intent standard applies," and that the "appeal turns on what level of intent is needed to invoke the double-damages provision . . . ."

## II. THE STATUTE

The relevant statutory language at issue, MCL 600.2961(5), states:

> A principal who fails to comply with this section is liable to the sales representative for both of the following:
>
> (a) Actual damages caused by the failure to pay the commission when due.
>
> (b) If the principal is found to have intentionally failed to pay the commission when due, an amount equal to 2 times the amount of commissions due but not paid as required by this section or $100,000, whichever is less.

A fundamental principle of statutory construction is that "a clear and unambiguous statute leaves no room for judicial construction or interpretation." *Coleman v Gurwin*, 443 Mich 59, 65; 503 NW2d 435 (1993). The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended. *Sun Valley Foods Co v Ward*, 460 Mich 230; 596 NW2d 119 (1999). When a legislature has unambiguously conveyed its intent in a statute, the statute speaks for itself and there is no need for judicial construction; the proper role of a court is simply to apply the terms of the statute to the circumstances in a particular case. *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 27; 528 NW2d 621 (1995).

The clear language of the statute evinces no textual intent to create a good faith defense to the double-damages

4

provision. Grammatically, the word "intentionally" modifies the phrase "failed to pay." The word "intentionally" is not defined in the statute. Where the Legislature has not expressly defined the common terms used in a statute, this Court may turn to dictionary definitions "to aid our goal of construing those terms in accordance with their ordinary and generally accepted meanings." *People v Morey*, 461 Mich 325, 330; 603 NW2d 250 (1999).

*Random House Webster's College Dictionary* (1991) defines "intentional" as "done with intention or on purpose; intended . . . ." Nothing in the generally accepted meaning of the word leads to the inference that a good faith belief on the part of the principal precludes recovery under MCL 600.2961(5)(b).[3] See, generally, Gillary & Albus, *Michigan's sales representative act revisited—again—or, does "intentionally" mean "in bad faith"?*, 2001 L R MSU-DCL 965. Therefore, under the clear language of the statute, if a principal deliberately fails to pay a commission when due, it is liable for double damages under the statute, even if the principal did not believe, reasonably or otherwise, that the commission was owed. There is no textual indication that a principal's good faith belief is relevant in making the determination that double damages are payable under the

---

[3] Defendant claims that the word "intentional" is a legal term of art, and not susceptible to the use of a lay dictionary. As used in the statute under consideration, we disagree. However, we note that the legal definition of "intentionally" provides defendant no relief. Black's Law Dictionary (6th ed) defines "intentionally" as "[t]o do something purposefully, and not accidentally."

statute.[4]

### III. May the Legislative History of the srca trump the statutory language?

Notwithstanding that the language of the statute does not require "bad faith" as a precondition to recovering double damages, defendant asserts that such a construction must be imposed by the courts. Defendant relies upon the legislative history of the statute in support of its position.[5]

---

[4]Some states that have passed similar acts have required a higher level of intentionality before additional damages are assessed. See Cal Civil Code 1738.15 ("willfully fails to pay commissions"); Ind Code 24-4-7-5(b) ("in bad faith fails to comply"); Mass Gen Laws Ann ch 104, § 9 ("wilfully or knowingly fails to comply"); Pa Consol Stat tit 43, § 1475(a) ("willfully fails to comply"); Tenn Code Ann 47-50-114(d) ("acting in bad faith, fails to comply").

[5] This Court has recognized the benefit of using legislative history when a statute is ambiguous and construction of an ambiguous provision becomes necessary. *Stajos v City of Lansing,* 221 Mich App 223; 561 NW2d 116 (1997); *People v Hall*, 391 Mich 175; 215 NW2d 166 (1974); *Liquor Control Comm v Fraternal Order of Eagles*, *Aerie No 629*, 286 Mich 32; 281 NW 427 (1938). However, we take this opportunity to emphasize that not all legislative history is of equal value, a fact that results in varying degrees of quality and utility of legislative history.

Clearly of the highest quality is legislative history that relates to an action of the Legislature from which a court may draw reasonable inferences about the Legislature's intent with respect to an ambiguous statutory provision. Examples of legitimate legislative history include actions of the Legislature intended to repudiate the judicial construction of a statute, see, e.g., *Detroit v Walker*, 445 Mich 682, 697; 520 NW2d 135 (1994), or actions of the Legislature in considering various alternatives in language in statutory provisions before settling on the language actually enacted. See, e.g., *Miles ex rel Kamferbeek v Fortney*, 223 Mich 552, 558; 194 NW 605 (1923). From the former, a court may be able to draw reasonable inferences about the Legislature's intent, even when the Legislature has failed to unambiguously express that intent. From the latter, by

(continued...)

6

In 1991, our Legislature passed Senate Bill 36, which was based on model language drafted by the Bureau of Wholesale Representatives. The language of the bill passed was the same as MCL 600.2961, except that it did not include the word "intentionally." Governor John Engler vetoed the bill on July 15, 1991. The veto message stated in part: "Second, I oppose the use of exemplary damages in contract actions absent broad public policy considerations and particularly in this case where exemplary damages would be assessed without consideration of the underlying factors resulting in breach of

_____

(...continued)
comparing alternative legislative drafts, a court may be able to discern the intended meaning for the language actually enacted.

Of considerably diminished quality as legislative history are forms that do not involve an act of the Legislature. "Legislative analyses" created within the legislative branch have occasionally been utilized by Michigan courts. These staff analyses are entitled to little judicial consideration in resolving ambiguous statutory provisions because: (1) such analyses are not an official form of legislative record in Michigan, (2) such analyses do not purport to represent the views of legislators, individually or collectively, but merely to set forth the views of professional staff offices situated within the legislative branch, and (3) such analyses are produced outside the boundaries of the legislative process as defined in the Michigan Constitution, and which is a prerequisite for the enactment of a law. Const 1963, art 4, §§ 26 & 33. In no way can a "legislative analysis" be said to officially summarize the intentions of those who have been designated by the Constitution to be participants in this legislative process, the members of the House and the Senate and the Governor. For that reason, legislative analyses should be accorded very little significance by courts when construing a statute.

Finally, it bears repeating that resort to legislative history of any form is proper *only* where a genuine ambiguity exists in the statute. Legislative history cannot be used to create an ambiguity where one does not otherwise exist.

contract."

In response to the Governor's veto, the Legislature added the word "intentionally." With that addition, the Governor signed the bill into law. 1992 PA 125. It does appear that the Governor vetoed the original bill in part out of a concern for the inappropriateness of awarding extracontractual damages on the basis of a mere breach of contract. The fact remains that the final bill enacted and signed into law did not cure the problem the Governor raised in his veto message.

Defendant's argument that the statute should be construed to include a good faith defense must fail because it violates a prime tenet of statutory construction: Michigan courts are bound to apply the unambiguous language actually used in a statute. *Danse Corp v Madison Hts*, 466 Mich 175, 182; 644 NW2d 721 (2002). Because the statute is clear, there is no ambiguity that would permit or justify looking outside the plain words of the statute. "'[W]e do not resort to legislative history to cloud a statutory text that is clear.'" *Chmielewski v Xermac, Inc*, 457 Mich 593, 608; 580 NW2d 817 (1998), quoting *Gilday v Mecosta Co*, 124 F3d 760, 767 (CA 6, 1997), quoting *Ratzlaf v United States*, 510 US 135, 147-148; 114 S Ct 655; 126 L Ed 2d 615 (1994). See also *Luttrell v Dep't of Corrections*, 421 Mich 93, 101; 365 NW2d 74 (1984).

### IV. The Nature of the SRCA

In *Lynch*, the opinion stated that "the SRCA clearly serves a punitive and deterrent purpose," 463 Mich 586, and that the act was "indisputably punitive, not compensatory," *id*. at n 4. These statements were made in response to the plaintiff's

8

argument that the statute was remedial and should be applied retroactively under the "exception" to the general rule of prospective application.

Defendant maintains that under Michigan case law, punitive damages are not available absent a showing of malicious or willful misconduct. In support of this argument, defendant cites *Peisner v Detroit Free Press*, 421 Mich 125; 364 NW2d 600 (1984).

In *Peisner*, the Court considered whether exemplary and punitive damages under the Michigan libel statute, MCL 600.2911(2)(b), resulted in plaintiff being compensated twice for the same injury.[6] In resolving this question, the Court stated that "exemplary and punitive damages for libel cannot be awarded in the absence of a finding that the defendant acted with common-law malice—in the sense of ill will or bad faith—in publishing the libel." *Id*. at 136.

There are distinct differences between the language of

---

[6] The statutory language at the time provided:

(b) Exemplary and punitive damages shall not be recovered in actions for libel unless the plaintiff, before instituting his action, gives notice to the defendant to publish a retraction and allows a reasonable time to do so, and proof of the publication or correction shall be admissible in evidence under a denial on the question of the good faith of the defendant, and in mitigation and reduction of exemplary or punitive damages. The retraction shall be published in the same size type, in the same editions and as far as practicable, in substantially the same position as the original libel.

9

the libel statute and that of the SRCA. The libel statute does not identify any particular mental state surrounding the libel before liability for exemplary or punitive damages attaches, whereas the SRCA expressly predicates liability on an intentional failure to pay. In addition, the libel statute explicitly permits the consideration of the "good faith of the defendant," MCL 600.2911(2)(b), whereas the SRCA is conspicuously silent on the subject.[7] The textual difference between the statutes militates against the application of the *Peisner* holding to the facts of this case.

The double-damages provision of the SRCA is irrefutably punitive rather than compensatory in the sense that it provides for an award of damages above and beyond that necessary to make plaintiff whole under the contract. However, that conclusion is not controlling or even relevant to the proper construction of this unambiguous statute. The clear and unambiguous language of the statute penalizes *intentional failure to pay*, without regard to the motivation of the principal. Under the language of the statute, it appears that the only cognizable defense to a double-damages claim is if the failure to pay the commission were based on

---

[7] The *Peisner* Court also relied on the now disfavored doctrine of legislative acquiescence in holding that "exemplary and punitive" damages are compensatory in nature for purposes of the libel statute. 421 Mich 133. See *Hanson v Mecosta Co Rd Comm'rs*, 465 Mich 492; 638 NW2d 396 (2002); *Donajkowski v Alpena Power Co*, 460 Mich 243; 596 NW2d 574 (1999); *People v Borchard-Ruhland*, 460 Mich 278; 597 NW2d 1 (1999).

10

inadvertence or oversight. The Legislature is certainly within its power to award "punitive-type" damages for such actions if it chooses to do so. The imposition of a contrary judicial gloss is inappropriate where the Legislature has clearly expressed its intentions in the words of the statute. *Nawrocki v Macomb Co Road Comm*, 463 Mich 143, 150; 615 NW2d 702 (2000); *Chmielewski*, supra at 606; *People v Gilbert* 414 Mich 191; 324 NW2d 834 (1982).

V. CONCLUSION

For the foregoing reasons, we conclude that the plain language of the double-damages provision of the statute requires only that the principal purposefully fail to pay a commission when the commission becomes due. Having answered the certified question, we return the matter to the United States Court of Appeals for the Sixth Circuit for further proceedings as deemed appropriate.

Robert P. Young, Jr.
Maura D. Corrigan
Clifford W. Taylor
Stephen J. Markman

11

*In re* CERTIFIED QUESTION FROM
THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT,

_____

KENNETH HENES SPECIAL PROJECTS
PROCUREMENT, MARKETING AND
CONSULTING CORPORATION,

    Plaintiff,

v                                     No. 120110

CONTINENTAL BIOMASS INDUSTRIES, INC,

    Defendant.

_____

CAVANAGH, J. (*concurring*).

    The majority holds that the plain language of the Michigan sales representative commission act (SRCA), MCL 600.2961, requires only that the principal purposefully fail to pay the commission when due before liability for an intentional failure to pay would arise. Although I agree with its result, I write separately to express my concern with the majority's narrow textualist approach to statutory interpretation.

## LEGISLATIVE HISTORY

    Though I agree that nothing need be gleaned from the

history in this case, I disagree with the majority's assertion that legislative history is wholly irrelevant when a statute lacks "ambiguity." Of course, statutory interpretation must always begin with the text. However, statutes subject to different reasonable interpretations are often held to be clear and unambiguous on the basis of definitions selected by this Court and provided by Webster's Dictionary. Contrary to the perspective of some of my colleagues, that type of analysis can, at times, prove unhelpful. Instead, it is often useful to consider legislative history because even those statutes lacking clearly contradictory language are often subject to different—yet reasonable—interpretations.[1] In this case, for example, the United States Court of Appeals for the Sixth Circuit found the term sufficiently ambiguous to warrant certification to this Court. Because a majority of this Court rarely finds a statute ambiguous, legislative history is seldom utilized, though many times it would be useful.

PURPOSE

In addition, I am troubled by the majority's failure to clarify that any other interpretation of the statute would render the punitive measure almost meaningless and clearly

---

[1] "Reading the legislative history puts the judge better in touch with the values, vocabulary, and policy choices of the authors of the statute—just as The Federalist does for the framers of the Constitution." Eskridge, *Textualism, The unknown ideal?* 96 Mich L R 1509 (1998).

2

contrary to the statute's purpose. "[T]he Court may depart from strict construction principles when a literal reading of the statute will produce absurd or illogical results, and this Court should attempt to give effect to all relevant statutory provisions." *DiBenedetto v West Shore Hosp*, 461 Mich 394, 408; 605 NW2d 300 (2000) (Cavanagh, J., dissenting); see also 1 Blackstone, Commentaries 61 ("[T]he most universal and effectual way of discovering the true meaning of a law, when the words are dubious, is by considering the reason and spirit of it . . . for when this reason ceases, the law itself ought likewise to cease with it."). I understand that some members of the majority disapprove of this doctrine, but it is most applicable. If an insurance company were exempt from punitive damages simply because it asserted a "reasonable" argument concerning a disputed commission, the statute would create no incentive to pay commissions owed to insurance sales agents.

For these reasons, I concur in the result only.

                                        Michael F. Cavanagh
                                        Marilyn Kelly

*In re* CERTIFIED QUESTION FROM
THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

KENNETH HENES SPECIAL PROJECTS
PROCUREMENT, MARKETING AND
CONSULTING CORPORATION,

    Plaintiff,

v                                     No. 120110

CONTINENTAL BIOMASS INDUSTRIES, INC.

    Defendant.

_____

WEAVER, J. *(concurring)*.

    I concur with the result reached by the majority. I write separately to state as I did in my dissent to the proposed amendment of MCR 7.305 that this Court lacks the constitutional authority to hear questions certified from

federal courts and that, therefore, MCR 7.305(B) represents an unconstitutional expansion of judicial power. 462 Mich 1208 (2000), see also *In re Certified Question (Wayne Co v Philip Morris, Inc)*, 622 NW2d 518 (2001).

Elizabeth A. Weaver