696 N.W.2d 687 (2005)
472 Mich. 1225
In re CERTIFIED QUESTIONS FROM THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT.
Sarah Melson, Plaintiff-Appellant,
v.
Prime Insurance Syndicate, Inc., Defendant-Appellee.
Docket No. 127088.
Supreme Court of Michigan.
May 26, 2005.
On order of the Court, the questions certified by the United States Court of Appeals for the Sixth Circuit are considered, and the Court respectfully declines the request to answer the certified questions.
WEAVER, J., concurs and states as follows:
I concur in the order declining to answer the questions certified by the United States Court of Appeals for the Sixth Circuit because I continue to question this Court's authority to answer such questions. See, e.g., Proposed Amendment of MCR 7.305, 462 Mich. 1208, 617 N.W.2d 329 (2000); In re Certified Question (Wayne Co. v. Philip Morris Inc.), 622 N.W.2d 518 (Mich., 2001); In re Certified Question (Kenneth Henes Special Projects Procurement, Marketing & Consulting Corp. v. Continental Biomass Industries, Inc.), 468 Mich. 109, 659 N.W.2d 597 (2003). Justice Young also questions this Court's authority to answer questions certified by the federal courts, post;[1] and Justice Levin has questioned this Court's authority. See In re Certified Question (Bankey v. Storer Broadcasting Co.), 432 Mich. 438, 462-471, 443 N.W.2d 112 (1989) (separate opinion of Levin, J.). Therefore, I decline to answer the questions in this case.
In light of the reasons offered by Justice Markman as support for his opinion that the Court has the authority to answer such questions, as well as the statements that have been made by Justice Levin, Justice Young, and myself on this issue, this Court should open an administrative file to consider the constitutionality of MCR 7.305. After taking public comment on this important issue, the Court can then decide definitively whether or not it has authority to answer certified questions, and, if it decides that it does have authority, clearly identify the basis for that authority because, to date, as Justice Markman notes, no basis has been clearly identified.
YOUNG, J., concurs and states as follows:
I concur in the order declining to answer the questions certified by the United States Court of Appeals for the Sixth Circuit. Any construction of Michigan law that we would have provided by answering the certified questions would have been merely "advisory" because our decision would not have been binding. Absent an express constitutional exception, such as Const. 1963, art. 3, § 8,[2] any nonbinding decision issued by this Court is beyond the "judicial power" of this Court and, therefore, unconstitutional.
*688 In 2000, this Court considered repealing MCR 7.305(B). I joined then-Chief Justice Weaver's dissenting statement, which concluded that the certified question process was unconstitutional.[3] I wrote separately and reiterated this position in In re Certified Question (Wayne Co. v. Philip Morris Inc.).[4] Having realized, however, that my concerns about the constitutionality of MCR 7.305(B) failed to carry the day, I have since honored the majority position of this Court and participated in certified question matters.[5] However, Justice Markman's lengthy statement justifying MCR 7.305(B) and these particular certified questions warrant an equally thorough response.[6]

I. THIS COURT MAY CONSTITUTIONALLY EXERCISE ONLY "JUDICIAL POWER"
The Michigan Constitution specifically provides that "[t]he judicial power of the state is vested exclusively in one court of justice...."[7] I agree with Justice Markman that "the entirety of the `judicial power' has been given to this Court" by the people of this state.[8] I disagree, however, with Justice Markman's apparent belief that the "judicial power" is an unbounded grant of judicial authority that permits this Court to entertain certified questions from courts of other jurisdictions.[9] The central flaw in Justice Markman's analysis is his belief that the Supremacy Clause[10] and Erie[11] doctrine grant to this Court a power that the people of this state did notthe power to issue advisory opinions on Michigan law to the courts of other jurisdictions.

II. "JUDICIAL POWER" DOES NOT ENCOMPASS THE AUTHORITY TO ISSUE NONBINDING ADVISORY OPINIONS
The phrase "judicial power" is a legal term of art. Indeed, it has been used identically in the Michigan constitutions of 1835,[12] 1850,[13] 1908,[14] and 1963.[15] Because the phrase is a legal term of art, we are to construe the phrase in its "technical, legal sense" in order to give effect to the intent of the ratifiers of Const. 1963, art. 6, § 1, who understood the phrase to have a "peculiar and appropriate meaning in the law."[16] This understanding can only be *689 discerned by "delving into [the] body of case law" interpreting the phrase.[17]
An examination of the case law clearly indicates that the phrase "judicial power" does not have the all-encompassing scope that Justice Markman's statement accords it. Instead, the phrase has a much more limited meaning. One such fundamental definitional limitation of judicial authority is that any opinion issued by a Michigan court must be binding. Justice Campbell explained this essential point in 1867 in the case of Underwood v. McDuffee:
The judicial power, even when used in its widest and least accurate sense, involves the power to "hear and determine" the matters to be disposed of; and this can only be done by some order or judgment which needs no additional sanction to entitle it to be enforced. No action which is merely preparatory to an order or judgment to be rendered by some different body, can be properly termed judicial.[[18]]
This Court wholly endorsed Underwood and the binding nature of "judicial power" in the 1884 case of Risser v. Hoyt,[19] in which Justice Champlin stated:
[T]he exercise of judicial power in its strict legal sense can be conferred only upon courts named in the Constitution. The judicial power referred to is the authority to hear and decide controversies, and to make binding orders and judgments respecting them.[[20]]
In fact, just four years before the 1963 Constitution was ratified, this Court again endorsed the Underwood/Risser definition of `judicial power' in the 1959 case of Johnson v. Kramer Bros. Freight Lines, Inc.[21]
It is clear, therefore, that the ratifiers of the 1963 Constitution understood the phrase to be a legal term of art with a very precise meaninga meaning that had been consistently construed in the case law for approximately one hundred years before the ratification of Const. 1963, art. 6, § 1. Indeed, writing for the Court in Nat'l Wildlife Federation v. Cleveland Cliffs Iron Co,[22] Justice Markman recently noted that the phrase "judicial power" was "well understood by scholars, lawyers, judges, and even laymen" at the time of the 1961 constitutional convention.[23]
Moreover, in 2001, Chief Justice Taylor, writing for the Court in Lee v. Macomb Co. Bd. of Comm'rs,[24] specifically relied on the Risser Court's definition of "judicial power."[25] Additionally, just last term in Nat'l Wildlife, Justice Markman aptly noted that "the `judicial power' has traditionally been defined by a combination of considerations," including "the ability to issue proper forms of effective relief...."[26]
It is undeniable, therefore, that the proper exercise of "judicial power" by this Court must involve a decision that is binding and not merely advisory. A nonbinding decision issued by this Court would be an unconstitutional exercise of power. Justice Markman wisely pointed out in *690 Nat'l Wildlife that, "`judicial power' is a matter of considerable constitutional significance"[27] and that this Court must refrain from "transforming the `judicial power' from a concept of constitutional stature into a mere prudential concept...."[28]

III. THIS COURT HAS NO POWER TO ENFORCE ANY DECISION IT MAKES ON THE ISSUES CERTIFIED
In the present case, our answers to the Sixth Circuit's certified questions would not have been binding in any way. Such a nonbinding, advisory opinion would have been inconsistent with the "judicial power" granted to this Court by the people of this state and, therefore, an unconstitutional exercise of our power.[29] Indeed, no certified question from a court of another jurisdiction could ever pass constitutional muster because this Court would lack authority to force the other jurisdiction to follow our decision. We have absolutely no authority to force a federal court, sister state court, or tribal court to adopt our answer to a certified question.[30]
In his statement, Justice Markman attempts to overcome this constitutional impediment to the certified question process by asserting that this Court's answers to the certified questions "will be relied upon" by the Sixth Circuit.[31] While I tend to agree with Justice Markman that it is entirely likely that the Sixth Circuit would have relied on our answers to the certified questions, this is beside the point. The point is not whether the Sixth Circuit would or would not have relied on our answer, but rather that we could not have compelled the Sixth Circuit to rely on our decision. Because we would have no enforcement power, our decision necessarily would have been advisory and nonbinding and therefore not a proper exercise of "judicial power" in the constitutional sense. Even Justice Markman conceded in Nat'l Wildlife that an "advisory opinion" issued by this Court is "potentially beyond the traditional `judicial power.'"[32] I agree with his position in Nat'l Wildlife rather than his statement here.
I am also not persuaded by Justice Markman's assertion in his statement that the certified question process is constitutional because "the Michigan Legislature since at least 1963 has statutorily affirmed *691 the jurisdiction of this Court over `any case brought before it for review in accordance with the court rules promulgated by the supreme court, including presumably MCR 7.305(B), MCL 600.215."[33] To describe MCL 600.215 as a "statutory affirmation" of this Court's certified question procedure seems an unduly expansive view of legislative regard for our rules. It merely recognizes our constitutional authority to make rules of procedure. It surely constitutes no legislative endorsement of MCR 7.305(B).[34]
More significant, an unconstitutional court rule does not magically become constitutional because the Legislature has acquiesced in or even endorsed it. The Legislature has no authority to absolve a rule that is constitutionally flawed. As Justice Markman perceptively noted in Nat'l Wildlife:
When a broadening and redefinition of the "judicial power" comes not from the judiciary itself, usurping a power that does not belong to it, but from the Legislature purporting to confer new powers upon the judiciary, the exercise of such power is no less improper.[35]

IV. THE QUESTIONS CERTIFIED DO NOT CLEARLY IMPLICATE MICHIGAN LAW
Additionally, I disagree with Justice Markman's statement that "[t]he Sixth Circuit has acted responsibly" in certifying the present questions to us.[36] Setting aside the substantial constitutional concerns that I have already discussed, there are numerous practical reasons why it was proper to decline the Sixth Circuit's request in this instance. First, the Sixth Circuit has asked us to interpret Michigan law in helping it to resolve the underlying contract dispute between the parties, despite the fact that the parties' contract has an unambiguous Illinois choice of law provision. Second, it is not clear that the legislation the Sixth Circuit has asked us to interpret even applies to the defendant, a "surplus line carrier." Third, the parties have indicated that the Sixth Circuit has misunderstood and misstated their arguments. These practical concerns were reason alone to deny the Sixth Circuit's request.

V. CONCLUSION
We are permitted to exercise only that power which is authorized under our Constitution. Because nonbinding decisions issued pursuant to MCR 7.305(B) fall outside the "judicial power" authorized under Const. 1963, art. 6, § 1, it is entirely proper for this Court to refrain from answering the questions presented. By declining to *692 answer the certified questions, we are not "ceding responsibility for the interpretation of Michigan law,"[37] but rather remaining true to the highest form of law in our stateour Constitutionand honoring those who gave the law: the people of Michigan.
MARKMAN, J., dissents and states as follows:
This is to respond to the concurring statements of Justices Weaver and Young, the former of which questions this Court's authority to answer certified questions and the latter of which concludes that to answer such questions would be "inconsistent with the `judicial power' granted to this Court...." Ante at 689. I respectfully disagree with the latter statement, and conclude that this Court does possess the authority to answer certified questions. Moreover, I believe that it is important that we answer such questions. Nonetheless, I commend Justices Weaver and Young for recognizing this Court's obligation to identify the source of its authority in this matter, something that we have not clearly done in the past. While the opposition argument has been made, not only by Justice Young, but also by Justice Levin in his separate opinion in In re Certified Question (Bankey v. Storer Broadcasting Co.), 432 Mich. 438, 443 N.W.2d 112 (1989), no substantial argument has yet been made in support of the exercise of federal certified question authority despite the fact that this Court has been expressly authorized by its own rules for more than four decades to answer such questions, GCR 1963, 797; MCR 7.305(B), and has, in fact, answered certified questions on a sporadic basis for more than two decades, In re Certified Questions (Karl v. Bryant Air Conditioning), 416 Mich. 558, 331 N.W.2d 456 (1982).
In my judgment, this Court's authority to answer federally certified questions derives from the following sources of law:
(1) Michigan Sovereignty. As the Supreme Court of Oklahoma has observed, "This Court needs no explicit grant of jurisdiction to answer certified questions from the federal court; such power comes from the United States Constitution's grant [sic, recognition of the reservation, see U.S. Const., Am. X] of state sovereignty." Shebester v. Triple Crown Insurers, 826 P.2d 603, 606 n. 4 (Okla., 1992). The Ohio Supreme Court has similarly observed, "[W]e need no grant of jurisdiction in order to answer certified questions.... In our view, such a power exists by virtue of Ohio's very existence as a state in our federal system." Scott v. Bank One Trust Co., NA, 62 Ohio St.3d 39, 42, 577 N.E.2d 1077 (1991).
We begin with a truism: the Ohio Constitution permits the state to exercise its own sovereignty as far as the United States Constitution and laws permit. Since federal law recognizes Ohio's sovereignty by making Ohio law applicable in federal courts, the state has the power to exercise and the responsibility to protect that sovereignty. Therefore, if answering certified questions serves to further the state's interests and preserve the state's sovereignty, the appropriate branch of state governmentthis courtmay constitutionally answer them. [Id.]
See also Sunshine Mining Co. v. Allendale Mut. Ins. Co., 105 Idaho 133, 136, 666 P.2d 1144 (1983); In re Elliott, 74 Wash.2d 600, 616-617, 446 P.2d 347 (1968). In answering a certified question, what this Court does is to preserve the integrity of the laws and Constitution of Michigan in a circumstance in which a judicial body that *693 is not a part of this state nonetheless is constitutionally obligated to apply Michigan laws and the Michigan Constitution. There are few elements more fundamental to a state's sovereignty than the maintenance and preservation of its own legal institutions. There is perhaps no more indispensable badge of sovereignty than the ability of a government to enforce its own laws. "The state's sovereignty is unquestionably implicated when federal courts construe state law." Scott, supra at 42, 577 N.E.2d 1077. "Certification serves to preserve the state's sovereignty by ensuring that federal courts correctly apply [state law]." Grover v. Eli Lilly & Co., 33 F.3d 716, 719 (C.A.6, 1994). To the extent that answering a certified question assists a federal court to apply Michigan laws and the Michigan Constitution accurately and in accord with the governmental processes that have been established by "we the people" of Michigan, the sovereign interests of this state have been furthered. For whenever Michigan law is misinterpreted, no matter how much care has been taken by a federal court to faithfully give meaning to that law, a toll has been taken in terms of the integrity of that law. As the Chief Justice of the Indiana Supreme Court has observed, the "certified question insures that the state supreme court decides important and often novel issues of state constitutional law." Shepard, Is Making State Constitutional Law through Certified Questions a Good Idea or a Bad Idea?, 38 Val. U. L. R. 327, 339 (2004). As with any other sovereign, Michigan is entitled to undertake actions that are reasonably necessary to maintain and preserve the elements of its sovereignty, including those protective of the foundations of its own rule of law. And no affirmative grant of authority is required beyond the inherent attributes of sovereignty.
(2) Federal Structure. In Erie R. Co. v. Tompkins, 304 U.S. 64, 71, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the United States Supreme Court made clear that a federal court sitting in a diversity case must apply "the laws of the several states," including the interpretations of those laws by the courts of these states.
"[L]aw in the sense in which courts speak of it today does not exist without some definite authority behind it. The common law so far as it is enforced in a State, whether called common law or not, is not the common law generally, but the law of that State existing by the authority of that State without regard to what it may have been in England or anywhere else.... [T]he authority and only authority is the State, and, if that be so, the voice adopted by the state as its own (whether it be of its Legislature or of its Supreme Court) should utter the last word." [Id. at 79, 58 S.Ct. 817 (citation omitted).]
Therefore, the Supreme Court concluded that the rule of Swift v. Tyson, 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842), in which federal "common law" authority had been placed in the federal courts in diversity cases, posed an "`unconstitutional assumption of powers by Courts of the United States,'" Erie, supra at 79, 58 S.Ct. 817 (citation omitted), and "invaded rights which in our opinion are reserved by the Constitution to the several states." Id. at 80, 58 S.Ct. 817. Answering certified questions is one reasonable means by which this Court minimizes the risk that Michigan laws will be misconstrued and misapplied by the federal courts. That there may be other means available for communicating the laws of this stateall of a less effective character than the certified question, for each would allow the litigant in the certified case itself to chance the misapplication of Michigan law, without recourse to this Courtdoes not preclude Michigan from choosing to employ *694 the certified question as one important vehicle for ensuring the integrity of its own laws.
In conjunction with Murdock v. City of Memphis, 87 U.S. (20 Wall.) 590, 22 L.Ed. 429 (1874), in which the United States Supreme Court held that it lacked appellate jurisdiction to review questions of state law, Erie makes clear that Michigan is fully responsible for its own law and possesses the necessary constitutional ammunition to protect that law. "Together Murdock and Erie give states control over their own law." Field, Sources of Law: The Scope of Federal Common Law, 99 Harv. L. R. 881, 921 (1986). Such control, however, is potential rather than actual until the states act affirmatively to maintain their own constitutional prerogatives.
In addition to vindicating this state right, the certified question also serves to vindicate a corollary federal right, which is the right of a litigant to bring certain types of lawsuits involving issues of state law in federal court. The certified question procedure assists in ensuring that litigants are subject to the same state law, whether their lawsuit is brought in state or federal court. A Michigan litigant, for example, need not sacrifice his or her constitutional right to bring a lawsuit in federal court out of concern that a different, and perhaps less protective, state law will be applied in federal court than in state court. See Elliott, supra at 616, 446 P.2d 347 ("We believe the citizens of the state are entitled to have the same rule of law applied on an issue regardless of whether it arises in a federal or state court.") The certified question procedure ensures a more uniform understanding of Michigan law, in whatever forum that law is applied. Thus, at the same time that the certified question reinforces the sovereign institutions of our state and prevents the infringement of our state's constitutional prerogative to maintain its own law, it also serves to uphold the right to invoke the federal judicial power by promoting the equal application of the law in federal and state judicial forums.
Certification is perhaps uniquely suited to further the principles of judicial federalism underlying the Supreme Court's decision in Erie. By allowing state, rather than federal, courts to supply "an authoritative response" in the very case in which an unsettled question of state law arises, certification ensures that statesacting through the agents of their choicerather than federal courts will exercise the "sovereign prerogative of choice" inherent in the resolution of unsettled questions of state law. [Clark, Ascertaining the Laws of the Several States, 145 U. Pa. L. R. 1459, 1550 (1997) (citations omitted).]
Nothing in the Michigan Constitution expressly grants jurisdiction to the courts of Michigan to entertain federal claims; it has long been understood that state courts may be required under some circumstances to resolve such claims, and to adjudicate federal rights. FERC v. Mississippi, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982); Testa v. Katt, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947). These judicial obligations arise out of the federal structure of our constitutional system and the Supremacy Clause of the federal constitution, art. VI. Although I do not view it as obligatory that a state court must respond to a federally certified question, cf. Smith, The Anticommandeering Principle and Congress's Power to Direct State Judicial Action: Congress's Power to Compel State Courts to Answer Certified Questions of State Law, 31 Conn. L. R. 649 (1999), the authority to answer such questions, just as the obligation to resolve certain federal claims and to adjudicate certain federal rights, is a function of the relationship between the national and state *695 governments within our federal constitutional architecture.
(3) Equal Footing Doctrine. The United States Supreme Court in Coyle v. Smith, 221 U.S. 559, 580, 31 S.Ct. 688, 55 L.Ed. 853 (1911), observed that our system of government was predicated upon the "constitutional equality" of the states, such equality being "essential to the harmonious operation of the scheme upon which the Republic was organized." Although it may be that Michigan can choose to deny itself some aspect of its own sovereignty, such as preserving the integrity of its own laws when they are applied by a court of the United States, I would not assume such a denialone that would place us on unequal footing with virtually every other state of the Union in terms of the constitutionally available tools for maintaining our sovereign institutionsabsent a clear limitation in our own Constitution. No such limitation exists, in my judgment. I would not deprive Michigan, virtually alone among the states, see Schneider, "But Answer Came There None": The Michigan Supreme Court and the Certified Question of State Law, 41 Wayne L. R. 273, 275 n. 1, Appendix (1995); Kaye & Weissman, Interactive Judicial Federalism: Certified Questions in New York, 69 Fordham L. R. 373, Appendix A (2000), of the authority to maintain effective control over its own laws, nor erode the right of the people of Michigan in diversity cases, virtually alone among the people of the United States, to have the dispositive law of their home state applied. As Const 1963, art. 1, § 1 states, "Government is instituted for the[ ] equal benefit, security and protection [of the people]." For this Court to nullify the certified question procedure, either by repeal or disuse, would be to undermine a procedure that is designed to assist in upholding this guarantee.
(4) Judicial Power. One argument in opposition to this Court's authority to answer federally certified questions is predicated upon Const. 1963, art. 3, § 8. See Bankey, supra at 468-469, 443 N.W.2d 112. This provision, contained in the "General Government" article of the Constitution, which precedes the "Legislative Branch," "Executive Branch," and "Judicial Branch" articles, allows either house of the Legislature or the Governor to certify questions to this Court. It is argued that this statement of authority implies the absence of federal certified question authority. This analysis is in error, in my judgment, for these distinct classes of certified questions have little in common beyond their nomenclature. The certified question authority set forth in article 3 modifies the relationships between the three branches of Michigan government, and would be inappropriately located in any of the three succeeding articles that address only the powers of a single one of these branches. Federal certified question authority, on the other hand, does not affect the "separation of powers" (which is another matter of attention in article 3, see art. 3, § 2), but rather concerns the sovereignty of Michigan within the American system of federalism. There is no negative implication for the existence of the federal certified question authority that reasonably arises from the creation of the legislative and executive certified question authority since these two authorities serve altogether different constitutional purposes.
The more relevant provisions to assess in determining whether there exists federal certified question authority are Const. 1963, art. 1, § 1 and art. 6, § 1. The former specifies that "[a]ll political power is inherent in the people" (emphasis added), while the latter specifies that all the "judicial power" is reposed in "one court of justice." That is, from the source of all of Michigan's political power, "the people," *696 the entirety of the "judicial power" has been given to this Court. Such power could have been withheld, in whole or part, or granted to some other institution of government, but it was not. It was reposed in this Court. While "the courts receive judicial power by grant in the State Constitution, the whole of such power reposing in the sovereignty is granted to those bodies except as it may be restricted in the same instrument." Washington-Detroit Theater Co. v. Moore, 249 Mich. 673, 680, 229 N.W. 618 (1930) (emphasis added).
The historical argument [that a declaratory proceeding is not part of the judicial power], however much it may circumscribe a government of granted powers, is not applicable to a sovereign State [of inherent powers]. [Id.]
The determination of Michigan law is at the core of the judicial power of this Court. There being no constitutional prohibition upon the consideration of federally certified questions, which are designed only to elicit such a determination, I believe that the judicial power of Michigan is broad enough to encompass the consideration of such questions. As a function of Michigan's general powers under both the United States and Michigan constitutions, in contrast to the limited powers of the federal government under the federal constitution, see U.S. Const., Am. X, it is simply insufficient to argue, as does Justice Young, that the absence of a specific grant of authority to a state court of Michigan is the equivalent of a denial of such authority. The argument must instead be that the "judicial power" of this state, which is all that this Court has been granted, is not broad enough to encompass federal certified question authority.
In its analysis of the judicial power, this Court continued in Moore:
When an actual controversy exists between parties, it is submitted in formal proceedings to a court, the decision of the court is binding upon the parties and their privies and is res adjudicata of the issue in any other proceedings in court in which it may be involved, what else can the decision be but the exercise of judicial power? [Id. at 680-681, 229 N.W. 618.]
In In re Richards, 223 A.2d 827, 829-830 (1966), the Maine Supreme Court expressly relied on Moore's definition of the judicial power and proceeded to its conclusion:
We conclude ... that our participation in the certification procedure will constitute a valid exercise of the "judicial power." We are satisfied that more will be involved than the mere rendering of a purely advisory opinion. The certification by the federal court becomes by the force of our statute the jurisdictional vehicle for placing the matter before the court for its action. Parties are before the court and are provided with the opportunity for presentation of briefs and oral argument customary upon appeal. The certification will make it apparent that there is a genuine live controversy between the parties pending in the federal court, a controversy based upon an existing factual situation which will be determined by our response to questions.... We rely upon the doctrine of [Erie] to make our decision and opinion given in answer to questions under this procedure conclusive and determinative in the federal courts with respect to the state of the law in Maine. [Id. at 832 (citations omitted).]
Cf. Federated Publications, Inc. v. City of Lansing, 467 Mich. 98, 112, 649 N.W.2d 383 (2002) (recognizing this Court's authority in the exercise of the judicial power to adjudicate moot cases or controversies where they present an issue that is likely *697 to recur yet regularly evade judicial review).
The subject matter of the federal certified question falls within the traditional scope of this Court's "judicial power," pertaining as it does to the meaning of Michigan law. Indeed, as noted, it falls within the exclusive "judicial power" of this Court to give dispositive meaning to such law. Further, the federal certified question entails the consideration of fully justiciable questions that are typically within the cognizance of the judicial power. Nor does the federal certified question call for a response that is truly in the nature of an "advisory opinion." Rather, while the answer to the federal certified question is sought in a context that is sui generis, the answer elicited from this Court will be relied upon to resolve an actual case or controversy. In Grover, supra at 719, the Sixth Circuit Court of Appeals made clear that this Court's response to a certified question will be treated as dispositive of that question:
Permission to certify questions of law has been graciously extended by the highest courts of all the states in our circuit. Certification has proved to be an important tool for federal courts sitting in diversity.... A federal court that certifies a question of state law should not be free to treat the answer as merely advisory unless the state court specifically contemplates that result. When a state supreme court accepts a certified question, it voluntarily undertakes a substantial burden and its resolution of the issue must not be disregarded.
... Certification serves to preserve the state's sovereignty by ensuring that federal courts correctly apply the law of [the state]. That state interest in protecting sovereignty would be undermined were federal courts to ignore the declarations of state law obtained through certification. [Citations omitted.]
See also Hosp. Underwriting Group, Inc. v. Summit Health Ltd., 63 F.3d 486, 493 (C.A.6, 1995) (federal courts are "not free to ignore applicable state law, even if the law is unpopular or represents a minority view, especially where the state's legislature and supreme court continue to approve of the law"). Federal certified questions appertain to genuine disputes between real disputants, albeit in federal, not state, court. For this reason, Michigan court rules wisely require a "factual statement" from the federal court, MCR 7.305(B)(2)(b), and the submission of briefs and a joint appendix from the parties, MCR 7.305(B)(3)(b)-(c), in order to reasonably remove the federal certified question from the realm of the abstract. The court's "factual statement" must be sufficient to afford context to this Court in understanding the question certified, a question that Michigan law "may resolve"not to persuade us that the proper question has been certified by the courtfor the resolution of the underlying case remains the responsibility of the federal court. The parties' briefings and appendix must similarly supply us with the information necessary to reasonably resolve the certified question.
Finally, there is no other impediment to the invocation of the judicial power that arises from the question itself being certified in this case, i.e., the certified question does not constitute a "political question" or a question of a sort that we would not address even if the question had originated in litigation brought in state court. As a result then of the specific character of the federal certified question, and as a result of the procedures established in Michigan for addressing such questions, I am convinced that this Court's authority to answer such questions is within our judicial power, and there is nothing in our Constitution *698 that removes it from this Court's power.
Practical Impact. In addition to addressing the matter of constitutional authority to answer the federal certified question, it would be derelict not to also recognize the many practical benefits of answering federal certified questions. The intelligent exercise of such authority: (a) contributes to an expedited process by which the definitive law of Michigan is resolved by this Court and made available to the federal courts, Arizonans for Official English v. Arizona, 520 U.S. 43, 76, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (certification process is one useful in "reducing the delay, cutting the cost and increasing the assurance of gaining an authoritative [state court] response"); (b) ensures that Michigan law is correctly and equally applied not only to litigants in diversity cases, but also to litigants in lower state courts that, in the absence of a definitive decision by this Court, might be inclined to defer excessively to existing federal court interpretations; (c) avoids litigative delays and costs far greater than the delays and costs inherent in certification caused when a federal court determines to abstain entirely from resolving an undecided issue of state law; (d) reduces incentives for forum shopping on the part of litigants who may seek out different federal and state formulations of state law; (e) avoids a legal regime in which, as former Sixth Circuit Court of Appeals Judge Wade McCree observed, pending a decision by the Michigan Supreme Court, "potential litigants are likely to behave as if the federal decision were the law of the state." McCree, Foreword, 1976 Annual Survey of Michigan Law, 23 Wayne L. R. 255, 257 n. 10 (1977), that is, the impact of failing to answer a certified question is not exclusively upon the federal litigants in that case, but is also felt by the general citizenry of Michigan, which in order to avoid litigation will tend to conform their conduct to what they understand as current law, the law of the federal court; (f) stabilizes the development of Michigan law by diminishing the degree of fluctuation in that law likely to result when two parallel judicial tribunals are responsible for the interpretation of the law; (g) minimizes the duplication of federal and state judicial decision-making resources; (h) assures the long-term stability of federal court judgments that might otherwise be called into question by the articulation of state law that is inconsistent with prior federal interpretations; and (i) obviates the problem of federal courts having to engage in the unusual judicial exercise of assessing not what that court understands the law to be in a given case, but what another court will say that law to be. This is a decidedly distinct exercise from a court assessing the law of a superior court and applying such law to the case before it, but rather involves judicial prediction. While I agree with Erie that this exercise is compelled by our nation's constitutional structure, I note merely that it is an unusual responsibility on the part of a federal judge and one with regard to which in the realm of Michigan law this Court can be of considerable assistance to federal courts.
Judicial Comity. To answer the federal certified question is also to serve the interest of comity between federal court and state court, and such an interest should be served whenever possible. The Sixth Circuit has demonstrated comity here by the act of certification, for "by using ... certification... the federal courts [seek to avoid] federal intrusion into the state law-making function." Scanelli, The Case for Certification, 12 Wm. & Mary L. R. 627, 641 (1971). When not inconsistent with other governmental interests, such comity is, I believe, expected by the people of *699 Michigan, who are served by both state and federal institutions. As noted, the Sixth Circuit here is engaged in carrying out the important and necessary, but nonetheless unusual, responsibility of attempting to discern the meaning of as-of-yet undecided state law. To the extent that this Court can assist the federal court in this nontraditional responsibility by exercising its own traditional responsibilities of saying what Michigan law is, I can see no reason why this should not be done. The comity reflected in answering certified questions goes well beyond our willingness to respond to the request for assistance by another institution of government; it is also reflected in the various future tensions that will be avoided by our answer. As former Fifth Circuit Court of Appeals Judge John R. Brown once observed, "It has been awkwardand, to some, not a little embarrassingwhen our first guess turns out to be wrong and the state court makes the second and last guess by reversing our holding." Brown, Certification in Action, 7 Cumb. L. R. 455, 455 (1977). "One invaluable attribute of the certification process ... is that it presents the rare occasion when courts of different systems can talk to one another about common problems." Cuesnongle v. Ramos, 835 F.2d 1486, 1493 (C.A.1, 1987).
Where this Court answers a certified question, there is one less instance in which a state court will be required to opine that it "disagrees" with the federal court, or in which a federal court will be required to opine that it and the Michigan Supreme Court have "disagreed." Further, in one less instance, neither of these courts will be required to fashion questionable distinctions in the law in order to avoid disagreements and confrontations with the other. And in one less instance, no state court will dismissively treat a federal court decision as nonprecedential and then expect such federal court in return to respectfully abide by the state court decision. As Professor Phillip Kurland has written, certification constitutes "a demonstration of cooperative judicial federalism which would justify those of us who think the federal form of government has a contribution to make toward the preservation of justice in this country." Kurland, Toward a Co-operative Judicial Federalism: The Federal Court Abstention Doctrine, 24 FRD 481, 490 (1960); Lehman Bros. v. Schein, 416 U.S. 386, 390-391, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974) ("certification ... helps build a cooperative judicial federalism").
The Sixth Circuit has acted responsibly in certifying questions to the state courts within its boundaries, including those state courts that have been more receptive to certified questions over the years than this Court. See Schneider, supra at 321 ("Relative to the Michigan Supreme Court, the highest courts of the other states within the Sixth Circuit appear to be much more receptive of certified questions from the Sixth Circuit."); see, for example, the odd situation of Larson v. Johns-Manville Sales Corp., 427 Mich. 301, 310, 399 N.W.2d 1 (1986), in which this Court cited as persuasive authority a federal district court case decided only after this Court refused to answer a certified question. The Sixth Circuit has acted responsibly, and this Court should act equally responsibly in assisting it to understand the law of our own state, a law to which we are constitutionally empowered to give dispositive meaning. The comity inherent in answering the certified question is a comity that is in the interest of both federal and state courts, as well as of the constitutional institutions that the judges of these courts take an oath to honor.
Consensus of Authority. Finally, in addition to the several sources of constitutional authority set forth in this statement, *700 I also draw some confidence that the federal certified question is a constitutional process in Michigan from the overwhelming consensus that has developed in support of this procedure. This consensus is evidenced in part from the following facts: (a) the overwhelming number of states, although possessing constitutions similar in relevant respects to Michigan's concerning the judicial power, themselves entertain certified questions, see Goldschmidt, American Judicature Society, Certification of Questions of Law: Federalism in Practice, pp. 34-35 n. 10 (survey reporting that only seven out of 284 state judges questioned had ever refused to certify a question from a federal court); Schneider, supra at Appendix; (b) Michigan's court rule, MCR 7.305(B), permitting certified questions has been in continuous existence since 1963; (c) the Michigan Legislature since at least 1963 has statutorily affirmed the jurisdiction of this Court over "any case brought before it for review in accordance with the court rules promulgated by the supreme court," including presumably MCR 7.305(B), MCL 600.215; (d) this Court, albeit sporadically, has entertained certified questions since at least 1982, Karl, supra, and as recently as 2003, In re Certified Question (Henes Corp. v. Continental Biomass Industries), 468 Mich. 109, 659 N.W.2d 597 (2003), and in 2000, we voted to reject the repeal of MCR 7.305(B); (e) each of the federal circuits, as well as the United States Supreme Court itself, see, e.g., Fiore v. White, 528 U.S. 23, 120 S.Ct. 469, 145 L.Ed.2d 353 (1999); Kaye & Weissman, supra at 384 n. 65, has certified questions to state courts, and the Supreme Court has also spoken approvingly of the procedure, without apparent dissent, on various occasions, see, e.g., Arizonans for Official English, supra; Clay v. Sun Ins. Office Ltd., 363 U.S. 207, 212, 80 S.Ct. 1222, 4 L.Ed.2d 1170 (1960); and (f) the federal certification procedure is supported by the Standing Committee on the United States Courts of the State Bar of Michigan, the Appellate Practice Section of the State Bar of Michigan, the United States District Courts for the Eastern District and the Western District of Michigan, the Sixth Circuit Court of Appeals, and the Federal Bar Association of Michigan.
Response to Justice Young. The thoughtful statement of Justice Young deserves particular response. To begin with, Justice Young characterizes my position as favoring an "unbounded" grant of judicial authority. I respectfully but strongly disagree. Rather, I favor an understanding of the "judicial power" that is in accord with its traditional exercise, and consistent with the powers accorded the judiciary under our Constitution. That my understanding of this power is broader than that of Justice Young hardly makes this understanding "unbounded."
The principal flaw in Justice Young's analysis is its failure to recognize that the exercise of this Court's "judicial power" is not merely "advisory," but is binding on the federal courts. Of course, in this unique judicial context, it cannot be binding on the federal courts in the exact way that our decisions are binding upon the Michigan Court of Appeals or the circuit court in Oakland County. But it is binding, not merely because the federal circuit court with jurisdiction over questions certified to this Court has said that it is binding, but more importantly because of why they have said it is binding. It is binding because Erie, itself based on our nation's constitutional structure, makes it binding. It is not by mere sufferance or even comity that the Sixth Circuit has made our determinations of Michigan law binding. Rather, "certification serves to preserve [Michigan's] sovereignty by ensuring that federal courts correctly apply the law of [Michigan]. That state interest in protecting *701 sovereignty would be undermined were federal courts to ignore the declarations of state law obtained through certification." Grover, supra at 719. This "state interest," in truth, constitutes the interest of all governmental institutions, state and federal, operating within the boundaries of the United States Constitution.
Moreover, in recognizing this interest, the Sixth Circuit relied on exactly the same source of lawthe United States Constitution and its definition of the relationship between the national and state governmentsas that relied on in this statement. This is, the one source of law that the state and federal courts have in common. While Justice Young views answers to certified questions as merely "advisory" because one sovereign ultimately cannot force its will upon another, this authority is better viewed as binding, in my judgment. There is a common source of law that is supreme to both judicial institutions, and it has been affirmatively recognized and invoked by each of these institutions in formal proceedings.
However, even if the Sixth Circuit did not feel so boundand it has said that it doesthis Court's exercise of the "judicial power" ultimately is not delegitimated by the responses or reactions of institutions or parties beyond our control. An executive officer may promise to ignore the decisions of this Court, or "massive resistance" may be employed in opposition to its determinations, but that does not transform a proper exercise of the "judicial power" into an improper exercise. For the reasons set forth in this statement, I believe that certified question authority constitutes a legitimate exercise of "judicial power," and that Justice Young has identified nothing within our Constitution or elsewhere that would deprive Michigan, nearly alone among the states, of this authority.
Finally, Justice Young not only misapprehends this Court's "judicial power" by defining it in an overly narrow fashion, but arguably manages at the same time to define this power in what some may view an overly broad fashion by suggesting that it is within our authority to instruct the federal judiciary that they may have certified the wrong question to the wrong court. However, resolving "choice of law" questions and interpreting federal statutes are matters that are properly within the jurisdiction of the federal courts. Thus, at least some will view Justice Young as having his constitutional understandings backward. He would interject this Court in matters that may be beyond our purview, while denying this Court a role in matters essential to maintaining the integrity of our state's legal institutions.
The truly unfortunate result of Justice Young's position is that the institutions created by the people of Michigan for creating and defining the laws of our state will necessarily be undermined and greater responsibility for the interpretation of these laws will be ceded to institutions that are not subject to the exclusive control of the people of Michigan. It is Justice Young's argument that this is what the people of Michigan desire, and this is what they have stated in their charter of government. I could not disagree more.
Conclusion. For the reasons set forth above, I would answer the certified questions presented.
By its refusal to answer these certified questions, the majority contributes to the distortion of our federal system of government by ceding responsibility for the interpretation of Michigan law to the federal judiciary, and by diminishing the control of the people of Michigan over the course of their own law. Those in the majority who have explained their rationale for their decision have grounded such decision in an *702 understanding of the Michigan Constitution that did not, and never could have been able to, secure the support of the independent citizenry of this or of any other state. Those in the majority who have not explained their rationale have neglected to identify the prudential considerations that in their judgment outweigh the defense of state sovereignty.
TAYLOR, C.J., and CORRIGAN, J., join the statement of MARKMAN, J.
NOTES
[1] See also In re Certified Question (Wayne Co v. Philip Morris Inc.), 622 N.W.2d 518 (Mich., 2001) (Young, J., concurring).
[2] Const. 1963, art. 3, § 8 provides:

Either house of the legislature or the governor may request the opinion of the supreme court on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date.
[3] Proposed Amendment of MCR 7.305, 462 Mich. 1208, 617 N.W.2d 329 (2000).
[4] 622 N.W.2d 518 (Mich., 2001).
[5] See, e.g., In re Certified Question (Kenneth Henes v. Continental Biomass Industries, Inc.), 468 Mich. 109, 659 N.W.2d 597 (2003).
[6] As Justice Markman has noted, I have previously relied on the "negative implication" theory of Const. 1963, art. 3, § 8 in questioning the constitutionality of MCR 7.305(B). Post at 13. For the reasons indicated by Justice Markman in his statement, however, I agree that the "negative implication" theory is flawed. Instead, it is the fact that MCR 7.305(B) exceeds our "judicial power" under Const. 1963, art. 6, § 1 that renders MCR 7.305(B) constitutionally infirm.
[7] Const. 1963, art. 6, § 1 (emphasis added).
[8] Post at 695-696.
[9] Id. at 696 ("the judicial power of Michigan is broad enough to encompass the consideration of [certified questions from other courts]").
[10] U.S. Const., art. VI, cl. 2.
[11] Erie R Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).
[12] Const. 1835, art. 6, § 1 ("The judicial power shall be vested in one supreme court....").
[13] Const. 1850, art. 6, § 1 ("The judicial power is vested in one supreme court....").
[14] Const. 1908, art. 7, § 1 ("The judicial power shall be vested in 1 supreme court....").
[15] Const. 1963, art. 6, § 1 ("The judicial power of the state is vested exclusively in one court of justice....").
[16] MCL 8.3a; Wayne Co v. Hathcock, 471 Mich. 445, 469, 684 N.W.2d 765 (2004); see also People v. Babcock, 469 Mich. 247, 257, 666 N.W.2d 231 (2003).
[17] Hathcock, supra at 471, 684 N.W.2d 765.
[18] 15 Mich. 361, 368 (1867) (emphasis in original).
[19] 53 Mich. 185, 18 N.W. 611 (1884).
[20] Id. at 193, 18 N.W. 611 (emphasis added).
[21] 357 Mich. 254, 258, 98 N.W.2d 586 (1959).
[22] 471 Mich. 608, 684 N.W.2d 800 (2004).
[23] Id. at 627, 684 N.W.2d 800 n. 16.
[24] 464 Mich. 726, 629 N.W.2d 900 (2001).
[25] Id. at 738, 629 N.W.2d 900.
[26] Nat'l Wildlife, supra at 614 (emphasis added).
[27] Id.
[28] Id. at 624-625 n. 12, 684 N.W.2d 800.
[29] As this Court noted in Hathcock, "The only instance in which we are constitutionally authorized to issue an advisory opinion is upon the request of either house of the Legislature or the Governorand, then, only `on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date.'" Hathcock, supra at 484 n. 98, 684 N.W.2d 765.
[30] Even given that the Erie doctrine would have made our answer to a certified question binding on a federal court, it is the effect of federal, not Michigan, law that would have made this so. Moreover, Justice Markman offers no justification as to why our answer to a certified question would be binding on a sister state court or tribal court, both of which are permitted under MCR 7.305(B) to certify questions to this Court. While I realize that the latter two cases are not presently before us, they illustrate the constitutional shortcomings of MCR 7.305(B) and the limited reach of Justice Markman's Erie analysis. As long as we do not have to worry about whether our answer to a certified question would be binding on a sister state court or tribal court, why limit the reach of MCR 7.305(B) only to those courts?
[31] Post at 697.
[32] Nat'l Wildlife, supra at 625, 684 N.W.2d 800. Justice Markman noted that the "advisory opinion" authority granted under Const. 1963, art. 3, § 8, was an exception to the traditional notion of "judicial power." Id. at 624-625, 684 N.W.2d 800.
[33] Post at 700. MCL 600.215 provides:

The supreme court has jurisdiction and power over:
(1) any matter brought before it by any appropriate writ to any inferior court, magistrate, or other officer;
(2) any question of law brought before it in accordance with court rules, by certification by any trial judge of any cause pending or tried before him;
(3) any case brought before it for review in accordance with the court rules promulgated by the supreme court.
[34] If anything, I would categorize the Legislature's apparent inaction in denouncing MCR 7.305(B) more a legislative "acquiescence" than "affirmation." As we stated last term in Neal v. Wilkes, "`[l]egislative acquiescence' has been repeatedly rejected by this Court...." 470 Mich. 661, 668, 685 N.W.2d 648 n. 11 (2004). However, I can see no other justification for Justice Markman's reliance on MCL 600.215 as support for his position.
[35] Nat'l Wildlife, supra at 616, 684 N.W.2d 800.
[36] Post at 699.
[37] Post at 701.