**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 31, 2006

RANDALL G. PAIGE (Deceased),

      Plaintiff-Appellee,

v

      No. 127912

CITY OF STERLING HEIGHTS, Self-Insured,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH

TAYLOR, C. J.

In this case involving the Worker's Disability Compensation Act (WDCA), MCL 418.101 *et seq.*, the first issue is whether the phrase "the proximate cause" in MCL 418.375(2) means the sole proximate cause, i.e., "the one most immediate, efficient, and direct cause of the injury or damage." We conclude that it does, as we did in construing the identical phrase in the governmental tort liability act (GTLA), MCL 691.140 *et seq.*, in *Robinson v Detroit,* 462 Mich 439, 462; 613 NW2d 307 (2000). We therefore overrule *Hagerman v Gencorp Automotive,* 457 Mich 720; 579 NW2d 347 (1998), which incorrectly construed the phrase to mean "a proximate

cause" that is a substantial factor in causing the event. Accordingly, we vacate the decision of the Workers' Compensation Appellate Commission (WCAC) and remand this case to the WCAC for reconsideration. The second issue is when, in the circumstance of a parent-employee's death, a child of that person is entitled to a presumption of whole dependency. We conclude that a child is only entitled to the presumption if he or she was under the age of 16 at the time of the parent-employee's death. Because the WCAC erred in holding to the contrary, on remand, the WCAC must make the necessary factual determinations to apply this holding.

## I. FACTS AND PROCEEDINGS BELOW

Randall G. Paige worked as a firefighter for the city of Sterling Heights (hereafter defendant). On October 12, 1991, Paige was sent to the scene of a severe automobile accident. After extracting a three-year-old girl from an automobile and carrying her to an ambulance, Paige began experiencing an ache in his right arm. Approximately 30 minutes later, after he had returned to the fire station, Paige was completing a report of the automobile accident when he again experienced pain in his right arm. This time, the pain in his arm was accompanied by chest pains and profuse sweating. Paige was transported to a hospital, where he was diagnosed as having suffered a myocardial infarction. He did not return to work after this incident. In 1993, he was granted an open award of workers' compensation benefits by magistrate Donald Miller.[1]

---

[1] This award of workers' compensation benefits, however, was made subject to Paige's election of like benefits in lieu of workers' compensation benefits under

(continued…)

2

Paige suffered a second myocardial infarction on August 15, 2000. He was diagnosed as having coronary artery disease, and underwent a quadruple coronary artery bypass on August 21, 2000. On January 4, 2001, Paige died in his sleep. An autopsy report prepared by the Oakland County Medical Examiner's office noted that Paige suffered from occlusions of the left anterior descending coronary artery, right coronary artery, and four coronary bypass grafts. The deputy forensic pathologist who conducted the autopsy opined that Paige "died of arteriosclerotic[2] cardiovascular disease (heart attack)." The certificate of death that was completed by Paige's treating cardiologist, Dr. Mark Goldberg, lists the immediate cause of Paige's death as acute myocardial infarction, and further lists coronary artery disease as an underlying cause that existed for "years" before Paige's death and led to the immediate cause of death.

Paige's son, Adam Paige, who was eight years old when Paige suffered his first heart attack and 17 when Paige died, filed a claim for workers' compensation death dependency benefits pursuant to MCL 418.375(2).[3] Under this statute, the

---

(…continued)

MCL 418.161(1)(c). Because Paige elected to receive duty disability pension benefits from Sterling Heights, and the amount of duty disability pension benefits exceeded his weekly workers' compensation benefit amount, he never in fact received workers' compensation benefits.

[2] Arteriosclerosis is a hardening of the arteries. *Stedman's Online Medical Dictionary,* <http://www.stedmans.com/section.cfm/45> (accessed April 14, 2006).

[3] MCL 418.375(2) provides:

> If the injury received by such employee was the proximate cause of his or her death, and the deceased employee leaves dependents, as hereinbefore specified, wholly or partially dependent on him or her for

(continued…)

child of a deceased employee is entitled to death dependency benefits if he or she was dependent on the deceased employee and a work-related injury was the proximate cause of the parent-employee's death. In making his claim for death dependency benefits, Adam claimed that as a minor he had been dependent on his father for support. Further, he claimed that the work-related heart attack in 1991 had contributed to his father's death by weakening his heart and, therefore, constituted "the proximate cause" of his father's death under *Hagerman,* which held that the phrase does not mean the sole proximate cause of death but, rather, requires only a cause that is a substantial factor in the employee's death. *Hagerman, supra* at 728, 736. Defendant opposed the claim for death dependency benefits, arguing that Adam had not introduced evidence establishing that he was, in fact, dependent on his father. Moreover, defendant argued that *Hagerman* had been impliedly overruled by *Robinson,* which held that the phrase "the proximate cause" means the sole proximate cause or, in other words, "the one most immediate, efficient, and direct cause of the injury or damage. *Robinson, supra* at 462. Accordingly, defendant

(…continued)
> support, the death benefit shall be a sum sufficient, when added to the indemnity which at the time of death has been paid or becomes payable under the provisions of this act to the deceased employee, to make the total compensation for the injury and death exclusive of medical, surgical, hospital services, medicines, and rehabilitation services, and expenses furnished as provided in sections 315 and 319, equal to the full amount which such dependents would have been entitled to receive under the provisions of section 321, in case the injury had resulted in immediate death. Such benefits shall be payable in the same manner as they would be payable under the provisions of section 321 had the injury resulted in immediate death.

asserted that under the *Robinson* definition Randall Paige's work-related 1991 heart attack was not "the proximate cause" of his death.

Magistrate Andrew Sloss resolved both issues in Adam's favor. First, he determined that the *Hagerman* definition of "the proximate cause" applied and, therefore, the work-related heart attack that Randall Paige suffered in 1991 did not have to be the sole or most immediate cause of his death but, rather, only needed to be a substantial factor in the events leading to his death. He determined that the 1991 heart attack was a substantial factor in Paige's death, stating that all three doctors who testified at the hearing on Adam's claim "agreed that it was a combination of underlying coronary artery disease together with the cumulative damage to the heart that began with his work-related myocardial infarction in 1991" that caused Randall Paige's death in 2001. The magistrate concluded by determining that Adam was entitled to death dependency benefits as long as he qualified as a dependent. Noting that Adam's status as a dependent is to be determined as of the date of his father's 1991 work-related injury, MCL 418.341,[4] Magistrate Sloss recognized that Magistrate Miller had listed Adam as Randall Paige's dependent in his 1993 order granting Randall Paige an open award of benefits. He held that this determination of

---

[4] MCL 418.341 provides, in pertinent part:

Questions as to who constitutes dependents and the extent of their dependency shall be determined as of the date of the injury to the employee, and their right to any death benefit shall become fixed as of such time, irrespective of any subsequent change in conditions except as otherwise specifically provided in sections 321, 331 and 335.

5

dependency was controlling, and granted Adam's request for death dependency benefits.

Defendant appealed Magistrate Sloss's ruling to the WCAC. Again, defendant argued that the magistrate should have applied the *Robinson* definition of "the proximate cause." The WCAC, however, rejected defendant's argument, concluding that *Hagerman* was controlling because it specifically addressed MCL 418.375(2) while *Robinson,* on the other hand, involved a provision of the GTLA. Defendant also again challenged Adam's status as a dependent. Although it did not directly challenge Magistrate Sloss's reliance on Magistrate Miller's determination that Adam was, in fact, dependent on his father at the time of the 1991 work-related injury, defendant argued that Magistrate Sloss had erred by failing to address the extent of Adam's dependency. Specifically, defendant asserted that under this Court's decision in *Runnion v Speidel,* 270 Mich 18; 257 NW 926 (1934), the magistrate was required to make a factual determination regarding whether Adam was wholly or partially dependent on his father at the time of the 1991 work-related injury and, because Magistrate Sloss did not do so, and no evidence of whole or partial dependency existed in the record, the correct weekly compensation amount could not be calculated. The WCAC, however, rejected defendant's assertion that *Runnion* required such a factual determination of dependency and, instead, relied on *Murphy v Ameritech,* 221 Mich App 591; 561 NW2d 875 (1997), for the proposition that Adam was entitled to the conclusive presumption set forth in MCL 418.331(b)

6

that he was wholly dependent because he had been under the age of 16 at the time of his father's work-related heart attack in 1991.

Defendant applied for leave to appeal the WCAC's ruling in the Court of Appeals, again raising the proximate causation and dependency issues. The Court of Appeals, however, denied defendant's application for leave to appeal for lack of merit in the grounds presented. Unpublished order of the Court of Appeals, entered January 10, 2005 (Docket No. 256451). Defendant then applied for leave to appeal in this Court. We scheduled oral argument on whether to grant defendant's application or take other peremptory action permitted by MCR 7.302(G)(1), and directed the parties to address whether *Robinson* overruled *Hagerman*, and whether the WCAC erred by failing to follow *Runnion* and make a factual determination of the extent of Adam's dependency on his father at the time of his father's injury. 474 Mich 862 (2005).

## II. STANDARD OF REVIEW

Resolution of the issues in this case involves the interpretation of provisions of the WDCA. Statutory interpretation is a question of law that we review de novo. *Reed v Yackell,* 473 Mich 520, 528; 703 NW2d 1 (2005). As we stated in *Reed, supra* at 528-529:

> Our fundamental obligation when interpreting statutes is "to ascertain the legislative intent that may reasonably be inferred from the words expressed in the statute." *Koontz v Ameritech Services, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002). If the statute is unambiguous, judicial construction is neither required nor permitted. In other words, "[b]ecause the proper role of the judiciary is to interpret and not write the law, courts simply lack authority to venture beyond the unambiguous text of a statute." *Id*.

7

## III. ANALYSIS

If an employee who suffered an injury arising out of and in the course of employment dies before the period within which the employee is entitled to weekly workers' compensation benefits ends, the employee's death is considered to have ended the disability and relieves the employer of liability for further weekly benefits to the injured employee. MCL 418.375(1). However, under MCL 418.375(2), in lieu of such weekly payments to the employee, the employer is required to pay death benefits pursuant to MCL 418.321[5] if two requirements are met: (1) the work-related injury was "the proximate cause" of the employee's death, and (2) the deceased employee leaves dependents who were wholly or partially dependent upon the employee for support.[6]

---

[5] MCL 418.321 provides, in relevant part:

> If death results from the personal injury of an employee, the employer shall pay, or cause to be paid, subject to section 375, in 1 of the methods provided in this section, to the dependents of the employee who were wholly dependent upon the employee's earnings for support at the time of the injury, a weekly payment equal to 80% of the employee's after-tax average weekly wage, subject to the maximum and minimum rates of compensation under this act, for a period of 500 weeks from the date of death.

[6] See also MCL 418.301(1), which provides, in pertinent part:

> An employee, who receives a personal injury arising out of and in the course of employment by an employer who is subject to this act at the time of the injury, shall be paid compensation as provided in this act. In the case of death resulting from the personal injury to the employee, compensation shall be paid to the employee's dependents as provided in this act.

## A. THE PROXIMATE CAUSE

Primarily at issue in this case is the first requirement of MCL 418.375(2) that the work-related injury be "*the* proximate cause" of the employee's death. In *Hagerman,* a majority of this Court relied on *Dedes v Asch,*[7] which involved MCL 691.1407(2)(c) of the GTLA, for the proposition that the Legislature's use of the definite article "the" instead of the indefinite article "a" is inconsequential.[8] Under its interpretation of common-law principles of proximate causation, the *Hagerman* majority rejected the idea that by using the phrase "*the* proximate cause," the Legislature meant that the work-related injury had to be the sole proximate cause of the employee's death in order for the employer to be liable for death benefits under MCL 418.375(2).[9] Instead, the majority held that the employer was liable for death benefits even if there was more than one proximate cause of the employee's death, as long as the work-related injury was a "substantial factor" in the employee's death.[10]

In a dissent joined by Justices Weaver and Brickley, I argued that the Legislature's use of the phrase "*the* proximate cause" in MCL 418.375(2) unambiguously indicated its intent that the work-related injury must be the sole proximate cause of the employee's death in order for the employer to be liable for death benefits. My primary reasons for this conclusion were twofold. First, the term

---

[7] 446 Mich 99; 521 NW2d 488 (1994), overruled in part in *Robinson, supra* at 458-459.

[8] *Hagerman, supra* at 728-729.

[9] *Id.* at 729-734.

[10] *Id.* at 734-738.

9

"proximate cause" had a longstanding definition in Michigan's jurisprudence before the enactment of the WDCA.[11]   Second, the majority's analysis had improperly rewritten the statute by failing to recognize the Legislature's use of the word "the."[12]

Two years after *Hagerman,* in *Robinson, supra,* which involved MCL 691.1407(2)(c) of the GTLA, this Court overruled the part of *Dedes*, *supra,* on which the *Hagerman* majority had based its interpretation of MCL 418.375(2) of the WDCA, and held that the phrase "the proximate cause" as used in MCL 691.1407(2)(c) of the GTLA refers to the sole proximate cause, i.e., "the one most immediate, efficient, and direct cause preceding an injury."[13]   The heart of the *Robinson* majority's rationale, which relied in part on my dissent in *Hagerman* that the phrase "the proximate cause" is not synonymous with the phrase "a proximate cause," was as follows, *Robinson, supra* at 460-462:

> [T]he Legislature has shown an awareness that it actually knows that the two phrases are different. It has done this by utilizing the phrase "a proximate cause" in at least five statutes[16] and has used the phrase "the proximate cause" in at least thirteen other statutes.[17]   Given such a pattern, it is particularly indefensible that the *Dedes* majority felt free to read "the proximate cause" as if it said "a proximate cause." The error will not be compounded, as today this Court corrects the flawed analysis of the *Dedes* majority.

---

[11]  Although I did not directly reference it in my *Hagerman* dissent, the importance of this is that the Legislature has directed that when it uses terms in a statute that have acquired a peculiar and appropriate meaning in the law before the statute's enactment, the courts of this state are to accord those terms such peculiar and appropriate meaning.  MCL 8.3a.

[12] *Hagerman, supra* at 752-757 (Taylor, J., dissenting).

[13] *Robinson, supra* at 458-459.

Nevertheless, the fact that the Legislature sometimes uses "a proximate cause" and at other times uses "the proximate cause" does not, of course, answer the question what "the proximate cause" means other than to show that the two phrases should not be interpreted the same way. Our duty is to give meaning to the Legislature's choice of one word over the other.

We agree with the following analysis found in the dissent in *Hagerman v Gencorp Automotive*, 457 Mich 720, 753-754; 579 NW2d 347 (1998):

"Traditionally in our law, to say nothing of our classrooms, we have recognized the difference between 'the' and 'a.' 'The' is defined as 'definite article. 1. (used, esp. before a noun, with a specifying or particularizing effect, as opposed to the indefinite or generalizing force of the indefinite article a or an) . . . .' *Random House Webster's College Dictionary*, p 1382. Further, we must follow these distinctions between 'a' and 'the' as the Legislature has directed that 'all words and phrases shall be construed and understood according to the common and approved usage of the language . . . .['] MCL 8.3a; MSA 2.212(1). Moreover, there is no indication that the words 'the' and 'a' in common usage meant something different at the time this statute was enacted . . . ."

Further, recognizing that "the" is a definite article, and "cause" is a singular noun, it is clear that the phrase "the proximate cause" contemplates *one* cause. Yet, meaning must also be given to the adjective "proximate" when juxtaposed between "the" and "cause" as it is here. We are helped by the fact that this Court long ago defined "the proximate cause" as "the immediate efficient, direct cause preceding the injury." *Stoll v Laubengayer*, 174 Mich 701, 706; 140 NW 532 (1913). The Legislature has nowhere abrogated this, and thus we conclude that in MCL 691.1407(2)(c) the Legislature provided tort immunity for employees of governmental agencies unless the employee's conduct amounts to gross negligence that is the one most immediate, efficient, and direct cause of the injury or damage, i.e., the proximate cause.

_____

[16] See MCL 436.1801(3); MSA 18.1175(801)(3), MCL 600.2947(6)(a); MSA 27A.2947(6)(a), MCL 600.6304(8); MSA 27A.6304(8), MCL 691.1665(a); MSA 12.418(5)(a), and MCL 750.145o; MSA 28.342A(o).

[17] See MCL 257.633(2); MSA 9.2333(2), MCL 324.5527; MSA 13A.5527, MCL 324.5531(11); MSA 13A.5531(11), MCL 324.5534; MSA 13A.5534, MCL 418.375(2); MSA 17.237(375)(2), MCL

500.214(6); MSA 24.1214(6), MCL 600.2912b(4)(e); MSA 27A.2912(2)(4)(e), MCL 600.2912b(7)(d); MSA 27A.2912(2)(7)(d), MCL 600.2912d(1)(d); MSA 27A.2912(4)(1)(d), MCL 600.2947(3); MSA 27A.2947(3), MCL 600.5839(1); MSA 27A.5839(1), MCL 691.1407(2)(c); MSA 3.996(107)(2)(c), and MCL 750.90e; MSA 28.285e.

_____

Despite the fact that MCL 418.375(2) of the WDCA, at issue in this case, and MCL 691.1407(2) of the GTLA, which was at issue in *Robinson,* both use the phrase "the proximate cause," Adam argues that the definition of "the proximate cause" from *Robinson* should not be applied to MCL 418.375(2). Adam's primary argument in support of this assertion is that the GTLA, as a statute in derogation of the common law, is generally said to be strictly construed in favor of governmental immunity,[14] while the WDCA, being a remedial statute, is generally said to be liberally construed to grant, rather than deny, benefits.[15] Although we have stated and utilized these preferential rules of construction in the past, their application is unnecessary in this case because the proper definition of the phrase "the proximate cause" can be ascertained solely by reference to the common meaning of the term "the" and the peculiar meaning that the phrase "proximate cause" has acquired in the law. These preferential rules of construction do not nullify the general rule that statutes should be reasonably interpreted consistent with their plain and unambiguous meaning. See *Northern Concrete Pipe, Inc v Sinacola Cos-Midwest, Inc,* 461 Mich 316, 320-321; 603 NW2d 257 (1999). More importantly, they do not override the

---

[14] *Robinson, supra* at 459.

[15] *Hagerman, supra* at 739.

12

Legislature's clear directive in MCL 8.3a that common words, such as "the," are to be construed according to their common meaning and that words that have acquired a peculiar and appropriate meaning in the law, such as "proximate cause," are to be accorded such peculiar and appropriate meaning.

Accordingly, we overrule *Hagerman* and hold that the phrase "the proximate cause," as used in MCL 418.375(2) of the WDCA, refers to the sole proximate cause. In deciding to overrule *Hagerman*, we have not only considered the fact that it was wrongly decided but also whether less injury will result from overruling it than from following it.[16]  In making this determination we have considered whether *Hagerman* defies "practical workability," whether reliance interests would work an undue hardship, and whether changes in the law and facts no longer justify the *Hagerman* decision.[17]

*Hagerman* defies practical workability because a person reading the statute surely would not know that he or she cannot rely on what the statute plainly says. That is, a reader and follower of the statute would, because of *Hagerman's* rewrite, not be behaving in accord with the law.  Such a regime is unworkable in a rational polity.  This all gets back to the unrebutted truth that "it is to the words of he statute itself that a citizen first looks for guidance in directing his actions."[18]  Furthermore, *Hagerman* is not only inconsistent with the plain language of the statute, it is also

---

[16] *Pohutski v City of Allen Park,* 465 Mich 675, 693; 641 NW2d 219 (2002).

[17] *Robinson, supra* at 464.

[18] *Id.* at 467.

inconsistent with this Court's decision in *Robinson*. How are the people of this state to know what "the proximate cause" means when there is one case from this Court that states that it means one thing and another case that states that it means something else? When identical words in the law, lying within a similar statutory context, mean something altogether different, we do believe that there is a "practical workability" problem, not in the sense that a court of law cannot render some decision—no opinion of this Court is "unworkable" in that sense—but in the sense that the law is made a mockery, meaning one thing in one paragraph and something else in the next. The law is thereby made less workable in the sense that it is made more confusing and less decipherable to the ordinary citizen. As we noted this very term in *Joliet v Pitoniak,* 475 Mich 30, 40; 715 NW2d 60 (2006), when two decisions from this Court contain conflicting analysis, this Court is "obligated to resolve this conflict and decide which decision best reflects the legislative intent expressed in the words of the statute . . . ." This is true even where, as here, the conflicting decisions address the same or similar language, but not the same statutes.[19]

Regarding reliance interests, *Hagerman,* having been decided just eight years ago, has not become "so embedded, so accepted, so fundamental, to everyone's expectations that to change it would produce not just readjustments, but practical

_____

[19] Such was the case in *Joliet*, in which we overruled *Jacobson v Parda Fed Credit Union,* 457 Mich 318; 577 NW2d 881 (1998), a case involving a provision of the Whistleblowers' Protection Act, MCL 15.361 *et seq*., because its analysis conflicted with that utilized in *Magee v DaimlerChrysler Corp,* 472 Mich 108; 693 NW2d 166 (2005), a case involving a provision of the Civil Rights Act, MCL 37.2101 *et seq*.

14

real-world dislocations."[20]  Such reliance is only present where the prior decision has caused a large number of persons to attempt to conform their conduct to a certain norm.  For example, where an entire class of individuals or businesses purchase insurance and another entire class does not in reliance on a decision by this Court, this may be viewed as the sort of reliance that could cause "practical real-world dislocations."  Cf. *Pohutski v City of Allen Park,* 465 Mich 675; 641 NW2d 219 (2002).  There is a significant distinction between merely *complying* with precedent and affirmatively altering one's behavior in reliance on precedent.  Where there is mere *compliance* with precedent, the overruling of that precedent will not cause "practical real-world dislocations," but where a great number of people affirmatively alter their behavior in reliance on precedent, the overruling of a precedent may cause "practical real-world dislocations."[21]  This Court's decision in *Hagerman* cannot be

---

[20] *Robinson, supra* at 466.

[21] In his dissent Justice Cavanagh criticizes our approach as "a standardless, arbitrary theory" and asserts that it "completely guts" the test set forth in *Robinson*. *Post* at 7.  This is not true.  This is exactly the same standard that we set forth in *Robinson*, and it is not standardless.  As we explained in *Robinson*, the only instances in which we might decline to overrule a previous decision that erroneously interpreted a statute is when the previous decision has come to be relied upon by so many people and to such an extent that to overrule it "would produce chaos." *Robinson, supra* at 466 n 26.  One of the several examples we gave in *Robinson* was this Court's initial advisory opinion determining that the no-fault automobile insurance act is constitutional.  *In re Constitutionality of 1972 PA 294,* 389 Mich 441; 208 NW2d 469 (1973).  In reliance on this decision, thousands of Michigan motorists have purchased mandatory insurance policies that differ in the coverage they afford from the policies issued in fault-based systems; insurers providing coverage in Michigan, both Michigan-based and those based out of state, have completely revised their policies and practices in order to conform to the no-fault act; the office of the Commissioner of Insurance has altered its procedures, instituted its own rules and practices, and issued various bulletins dealing with issues arising out

(continued…)

15

said to have caused a great number of persons to affirmatively alter their conduct in any way, except in the sense that any law requires general compliance with its terms. It cannot be seriously argued that Randall Paige positioned himself in reliance on *Hagerman.* He, as indeed any injured employee we might see, did not script his unfortunate injuries and illnesses with reference to *Hagerman* or any other case of this Court. Nor did his lawyers proceed any differently because of *Hagerman.* Furthermore, for most of the duration of this litigation *Hagerman's* status was precarious, and known to be such, because *Robinson,* which made *Hagerman* untenable, was decided only two years after *Hagerman.*

Finally, we need not consider whether changes in the law and facts no longer justify *Hagerman* because *Hagerman* itself was never justified as it was a change in the law that this Court had the power, but not the authority, to make. It was not justified from its inception.

Thus, with *Hagerman* no longer controlling, we return to the language of the statute. It is the case that in order for an employer to be liable for death benefits under MCL 418.375(2), the deceased employee's work-related injury must have been "the one most immediate, efficient, and direct cause preceding [the death]."[22] We

(…continued)
of the no-fault act. This is the type of widespread reliance that may cause this Court, as a matter of prudence, to decline to overrule an earlier decision that was erroneously decided. In such a case, correcting the deficiency in this Court's prior ruling would be better left to the Legislature, which has the ability to enact comprehensive legislation that not only corrects this Court's error but also alleviates the problems caused by the extensive reliance interests.

[22] *Robinson, supra* at 459.

16

therefore remand this case to the WCAC for a determination whether Randall Paige's work-related injury was "the proximate cause" of his death under this standard.

## B. RESPONSE TO JUSTICE CAVANAGH

The dissent of Justice Cavanagh stridently criticizes the positions the majority has taken. His theme is that our positions are tedious in that we have argued them in the past, as well as that we are irresponsible. It is true that we have argued them previously, but in the law consistency is not normally seen as a defect; if it is, the dissent's arguments against our rather simple thesis, which holds that one who says "the proximate cause" has said something different than one who says "a proximate cause," are equally shopworn. In attempting to provide buoyancy for his argument that we are irresponsible, Justice Cavanagh restates the simply incorrect claim that we have overturned cases at an unprecedented rate. Yet, as we pointed out with statistics in *Sington v Chrysler Corp,* 467 Mich 144, 166-170; 648 NW2d 624 (2002), and *Mack v Detroit,* 467 Mich 186, 211; 649 NW2d 47 (2002), and as Victor E. Schwartz has also discussed in his article *A critical look at the jurisprudence of the Michigan Supreme Court,*[23] we have not done that. Unwilling to rebut either the statistics or the Schwartz analysis, Justice Cavanagh continues making the claim, hoping, one surmises, that readers will not know any better. We think they will.

---

[23] 85 Mich B J 38, 41 (January, 2006).

With regard to Justice Cavanagh's claim that history's judgment of us will be unkind, this also is not a new claim.[24] We think the concern should be his. Our core argument is that texts should be approached using the same doctrines every time. This could be described as a "truth in reading" approach. His is the less easily defended notion that sometimes you read statutes using textual and grammatical rules that all users of the language normally employ, but on other entirely unpredictable occasions you do not. Accordingly, while Justice Cavanagh in some cases does use the textual rules that courts have traditionally employed,[25] in others he jumps the textualist rails and employs interpretive approaches that disregard what the instrument actually says and instead rely on extratextual sources such as legislative testimony,[26] the perceived intent of the Legislature,[27] overarching policy considerations,[28] or even what has been described as the theory of "legislative

---

[24] See, e.g., *People v Goldston,* 470 Mich 523, 571; 682 NW2d 479 (2004) (Cavanagh, J., dissenting).

[25] See, e.g., *People v Barbee*, 470 Mich 283; 681 NW2d 348 (2004); *Title Office, Inc v Van Buren Co Treasurer*, 469 Mich 516; 676 NW2d 207 (2004); *Stanton v Battle Creek*, 466 Mich 611; 647 NW2d 508 (2002); *People v Stone*, 463 Mich 558; 621 NW2d 702 (2001); *In re MCI Telecom Complaint*, 460 Mich 396; 573 NW2d 51 (1998); *In re Wirsing*, 456 Mich 467; 573 NW2d 51 (1999).

[26] See, e.g., *Mayor of Lansing v Pub Service Comm,* 470 Mich 154, 184; 680 NW2d 840 (2004) (Cavanagh, J., dissenting); *Haynie v Dep't of State Police,* 468 Mich 302, 331-332; 664 NW2d 129 (2003) (Cavanagh, J., dissenting).

[27] See, e.g., *Devillers v Auto Club Ins Ass'n,* 473 Mich 562, 599-603; 702 NW2d 539 (2005) (Cavanagh, J., dissenting); *Mayor of Lansing, supra* at 173; *Neal v Wilkes,* 470 Mich 661, 674; 685 NW2d 648 (2004) (Cavanagh, J., dissenting).

[28] See, e.g., *Devillers, supra* at 594-613 (Cavanagh, J., dissenting); *Lind v Battle Creek,* 470 Mich 230, 235-243; 681 NW2d 334 (2004) (Cavanagh, J., dissenting); *Veenstra v Washtenaw Country Club,* 466 Mich 155, 168-174; 645 NW2d 643 (2002) (Cavanagh, J., dissenting).

befuddlement," which holds that the Legislature can, if we desire, be held to not know what it is doing and thus we need not do what it directs.[29]  It bears emphasizing that he has in the past provided no rationale regarding which technique he will use in any given case so that litigants, or even citizens attempting to structure their conduct to accord with the law, have no idea which Justice Cavanagh, the traditionalist or the deconstructionist, will decide the case.  In response to this assertion, he now argues that he only departs from the traditional approach when a statute is unclear or ambiguous, *post* at 17, yet even a casual review of the cases cited herein reveals that this defense will not bear scrutiny and that in fact he will find a way, no matter how tendentious (see in particular *Mayor of Lansing v Public Service Comm,* 470 Mich 154; 680 NW2d 840 [2004]), to declare that which he wishes to be ambiguous or unclear to be exactly that.  It is an approach of ambiguity by fiat.

Supplementing all these extratextual tools Justice Cavanagh uses to reach a desired outcome is his utilization of the notion of legislative acquiescence, which he deploys when an effort is made to overrule a past case where the law was not followed.  On such occasions, he argues, as he does in this case, that this Court should retain the previous interpretation of a statute that is clearly wrong simply because the Legislature has not amended the statute to correct our error.[30]  However,

---

[29] *Robinson, supra* at 460.

[30] See, e.g., *Devillers, supra* at 613-614; *Neal, supra* at 676-677; *Jones v Dep't of Corrections,* 468 Mich 646, 665; 664 NW2d 717 (2003) (Cavanagh, J., dissenting); *Mack v Detroit,* 467 Mich 186, 222; 649 NW2d 47 (2002) (Cavanagh, J., dissenting); *Robertson v DaimlerChrysler Corp,* 465 Mich 732, 767-768; 641 NW2d 567 (2002) (Cavanagh, J., dissenting).

as this Court explained in *Donajkowski v Alpena Power Co*, 460 Mich 243, 261; 596 NW2d 574 (1999), the doctrine of legislative acquiescence is not recognized in this state for the sensible reason that "sound principles of statutory construction require that Michigan courts determine the Legislature's intent from its *words*, not from its silence." (Emphasis in original.)[31] Not content to merely ignore *Donajkowski,* he advances a new argument for legislative acquiescence, which is the startling notion that once this Court "'interprets a statute, then the statute becomes what this Court has said it is'" and that "'it is neither more nor less than an amendment,'"[32] therefore making it impermissible for this Court to ever revisit its interpretation of the statute. This is an odd argument for Justice Cavanagh to make, and undeniably inconsistent with his own practices, given that he has in other cases in the last several years supported this Court's decisions to correct erroneous interpretations given to statutes in the past.[33] Moreover, his authority for this audacious statement is an unenthusiastice reference to United States Supreme Court Justice Hugo Black's lone dissenting statement in the 1970 case of *Boys Markets, Inc v Retail Clerks Union, Local 770*.[34] This is an unconvincing authority to cite, as even he seems to

---

[31] See also *Boys Markets, Inc v Retail Clerks Union, Local 770,* 398 US 235, 242; 90 S Ct 1583; 26 L Ed 2d 199 (1970) ("[T]he mere silence of Congress is not a sufficient reason for refusing to reconsider the decision.").

[32] *Post* at 14, quoting *Boys Markets, supra* at 257-258 (Black, J., dissenting).

[33] See, e.,g, *People v Williams,* 475 Mich 245, 265; 716 NW2d 208 (2006) (Cavanagh, J., concurring in the result only); *People v Schaefer,* 473 Mich 418, 450-451; 703 NW2d 774 (2005) (Cavanagh, J., concurring).

[34] Justice Cavanagh also attempts to support his position by selectively quoting from *Douglass v Pike Co,* 101 US 677, 687; 25 L Ed 968 (1879). *Douglass*,

(continued…)

acknowledge, because the majority did not share Justice Black's view[35] and, in that very case, overruled an earlier case that had improperly construed the statute at issue.[36] The consequential point, however, is that this dubious view of judicial power, even if it could be construed as defensible under the United States Constitution, is not defensible under the Michigan Constitution. Our Constitution strictly forbids a court from exercising legislative power by providing that "[n]o person exercising the powers of one branch [of government] shall exercise powers properly belonging to another branch . . . ."[37] In short, we cannot "amend" statutes and Justice Cavanagh's view is directly at odds with our own Constitution.

With the claimed federal authorities exposed as no authority at all, we return to the fact that Justice Cavanagh chooses to ignore the holding of this Court in

_____

(…continued)

however, does not support Justice Cavanagh's assertion that a judicial construction of a statute becomes part of the statute itself, thereby barring a court from revisiting its decision in the future. Rather, *Douglass* says only that a judicial construction of a statute becomes binding "so far as contract rights acquired under it are concerned." *Id.*

[35] Moreover, we would point out that Justice Black's conclusion to never revisit statutory construction cases is easier to square with the United States Constitution's separation of powers jurisprudence if it is seen, although he evidently did not, as an exercise of prudence. To not revisit a statute once construed is a utilitarian discipline perhaps compelled by that Court's need to devote itself primarily to constitutional adjudications. This "tyranny of the urgent" argument, if it pertains to the United States Supreme Court, which accepts appeals from 13 federal courts of appeals and all 50 states, surely does not pertain to this or any other state supreme court, and to our knowledge has never been asserted by one in this nation. We are frankly surprised that Justice Cavanagh would, in light of these difficulties, advance it in our state.

[36] *Boys Market, supra* at 237-238.

[37] Const 1963, art 3, § 2.

21

*Donajkowski*, just as he has ignored this Court's holdings rejecting his unprincipled approach to declaring statutes ambiguous.[38] In doing so, Justice Cavanagh reveals how little fidelity he has to precedent when he does not like the precedent. His argument on stare decisis then is, and should be seen as, entirely inconsistent. His test on when to leave the text and search for meaning elsewhere is really no more sophisticated than doing so when the desired outcome is one the text alone will not allow. This is, of course, an indefensible theory of jurisprudence even superficially. Further, it is dangerous because with it comes the death of predictability in the law. If institutionalized as a practice, our citizens could never tell in advance which judge, and thus what preferences, will control. If fully implemented in the law, our courts would be seen as only a scramble for jackpots. Much more can be said negatively of this "judicial supremacist" approach, and we have,[39] but at root it gives to judges, not to the people through the Legislature, control of public policy.[40] Our constitutions

---

[38] A by no means exhaustive list would include *Mayor of Lansing, supra* at 164-167; *Twichel v MIC General Ins Corp,* 469 Mich 524, 535; 676 NW2d 616 (2004); *People v Spann*, 469 Mich 904 (2003); *In re Certified Question (Kenneth Henes Special Projects v Continental Biomass Industries, Inc),* 468 Mich 109, 114-117; 659 NW2d 597 (2003); *Klapp v United Ins Group Agency, Inc,* 468 Mich 459, 474; 663 NW2d 447 (2003); *People v Jackson,* 467 Mich 939 (2003); *Sington, supra*; *Dan De Farms v Sterling Farm Supply, Inc,* 467 Mich 857 (2002); *Koontz v Ameritech Services, Inc,* 466 Mich 304, 317-318; 645 NW2d 34 (2002); *Lesner v Liquid Disposal, Inc,* 466 Mich 95, 103 n 9; 643 NW2d 553 (2002); *Crowe v Detroit,* 465 Mich 1, 13-16; 631 NW2d 293 (2001); *Nawrocki v Macomb Co Rd Comm,* 463 Mich 143, 175 n 30; 615 NW2d 702 (2000); *DiBenedetto v West Shore Hosp,* 461 Mich 394, 403-407; 605 NW2d 300 (2000).

[39] See, e.g., *Devillers supra* at 592-593; *Cameron v Auto Club Ins Ass'n,* 476 Mich __; __ NW2d __ (Docket No. 127018, decided July 28, 2006), slip op at 8-11.

[40] *Sington, supra* at 169-170; *Halloran v Bahn,* 470 Mich 572, 579; 683 NW2d 129 (2004); *Van v Zahorik,* 460 Mich 320, 327; 597 NW2d 15 (1999).

have never authorized such a usurpation,[41] and the cultivation and seizure of such power, we believe, itself invites history's reproach.

This response has also prompted Justice Cavanagh to claim that we are attacking him personally and being insufficiently respectful of our predecessors on this Court. This is not only inaccurate but peculiar coming from a justice who himself has this term accused the majority of writing an opinion to advance the majority members' interests,[42] and has, in the past, accused the justices in the majority of making "unforgivable" fabrications,[43] basing decisions on the view of what is "socially acceptable behavior,"[44] and having a "complete lack of respect" for civil rights.[45]

All we are doing is pointing out the problems with his methodology of deciding cases. That is not a personal attack. His claim should be seen as the latest volley in a years-long effort by the remnants of the pre-1999 Court and its supporters to do what they can to bring back the less disciplined approach of that Court.

---

[41] *Hagerman, supra* at 764-766 (Taylor, J., dissenting); Rehnquist, *The Supreme Court*, (New York: William Morrow and Company, Inc, 1987), p 275.

[42] *In re Haley,* 476 Mich __, __; __ NW2d __ (Docket No. 127453, decided July 31, 2006), slip op at 1 n 1 (Cavanagh, J., concurring).

[43] *Henry v Dow Chemical Co,* 473 Mich 63, 117; 701 NW2d 684 (2005) (Cavanagh, J., dissenting).

[44] *Shinholster v Annapolis Hosp,* 471 Mich 540, 601; 685 NW2d 275 (2004) (Cavanagh, J., dissenting).

[45] *Lind v Battle Creek,* 470 Mich 230, 236; 681 NW2d 334 (2004) (Cavanagh, J., dissenting).

In that era, Justice Cavanagh was much more influential because he had more colleagues who shared his approach. His influence has waned and with it the influence of those who benefit from the legal regime of which he was an unquestioned leader—a regime where the decisions were highly unpredictable, inconsistent, and virtually any claim was a possible winner. He and they are very unhappy with the changes and have not accommodated well to the current situation. The fact that we point out that Justice Cavanagh has articulated no consistent legal principles or methodology for deciding cases is neither a personal attack nor an occasion for martyrdom. However, for Justice Cavanagh, it is an inconvenient fact.

We close by returning to this case and what should not be lost sight of here. That is that in Justice Cavanagh's world it is perfectly normal, indeed correct, that sometimes absolutely identical phrases in our statutes, here "the proximate cause," have different meanings in different statutes. To express the notion is to expose its flaw. To the extent that Justice Cavanagh continues to espouse it and its justifying nostrums, we will continue to do our best to write of their shortcomings and to expose how compromising to the development of a principled jurisprudence they are.

## C.  DEPENDENCY

If the work-related injury qualifies as "the proximate cause" of the employee's death under the definition we have set forth above, the next inquiry under MCL 418.375(2) is whether the employee left dependents and, if so, whether they were "wholly or partially dependent on him or her for support . . . ." The answers to these questions are provided in MCL 418.341, which provides, in relevant part:

24

> Questions as to who constitutes dependents and the extent of their dependency shall be determined as of the date of the injury to the employee, and their right to any death benefit shall become fixed as of such time, irrespective of any subsequent change in conditions except as otherwise specifically provided in sections 321, 331 and 335.

Accordingly, under this statute, the workers' compensation magistrate must determine whether there were persons dependent on the deceased employee, and the extent of such dependency, by looking at the circumstances at the time of the work-related injury—not at the time of death. In the present case, Magistrate Miller listed Adam Paige as a dependent of Randall Paige when he issued his 1993 order granting Randall Paige an open award of benefits. Defendant did not appeal Magistrate Miller's 1993 order. Therefore, the issue whether Adam was dependent on his father at the time of the work-related injury is res judicata,[46] and defendant may not challenge it now. But, as defendant correctly argues, Magistrate Miller did not determine the *extent* of Adam's dependency on his father at the time of the work-related injury, i.e., whether Adam was wholly or partially dependent upon Randall Paige. Without such a determination being made, the rate of any weekly death benefits to which Adam may be entitled cannot be calculated.

---

[46] The doctrine of res judicata applies where: (1) there has been a prior decision on the merits, (2) the issue was either actually resolved in the first case or could have been resolved in the first case if the parties, exercising reasonable diligence, had brought it forward, and (3) both actions were between the same parties or their privies. *Baraga Co v State Tax Comm,* 466 Mich 264, 269; 645 NW2d 13 (2002); *Gursten v Kenney,* 375 Mich 330, 335; 134 NW2d 764 (1965).

The WCAC rejected defendant's argument and held that Adam is conclusively presumed to be wholly dependent under MCL 418.331, which provides, in pertinent part:

> The following persons shall be conclusively presumed to be wholly dependent for support upon a deceased employee:
>
> * * *
>
> (b) A child under the age of 16 years . . . upon the parent with whom he or she is living at the time of the death of that parent. . . . In all other cases questions of dependency, in whole or in part, shall be determined in accordance with the fact, as the fact may be at the time of the injury.

The WCAC's conclusion that Adam, who was under the age of 16 at the time of the injury but over the age of 16 at the time of the death, is entitled to the conclusive presumption of whole dependency was erroneous. In *Runnion, supra,* we interpreted the predecessor of MCL 418.331(b), which was substantively similar,[47] consistently with its plain terms, i.e., that the presumption of whole dependency applies *only* if the child was under the age of 16 at the time of the employee's *death*. If the child was, like Adam in this case, over the age of 16 at the time of the

---

[47] 1929 CL 8422 provided:

> The following persons shall be conclusively presumed to be wholly dependent for support upon a deceased employee:
>
> * * *
>
> (b) A child or children under the age of sixteen years, . . . upon the parent with whom he is or they are living at the time of the death of such parent . . . . In all other cases questions of dependency, in whole or in part, shall be determined in accordance with the fact, as the fact may be at the time of the injury.

26

employee's death, the fact that the child was under the age of 16 at the time of the injury does not entitle the child to the conclusive presumption of whole dependency. Instead, "[w]hether there was actual dependency, total or in part, at the time of the injury is a question of fact."[48]

In the present case, the WCAC noted our decision in *Runnion* but essentially ignored it, relying instead on statements made by the Court of Appeals in *Murphy, supra,* to conclude that a child is entitled to the presumption as long as the child was under the age of 16 at the time of the work-related injury. There are two problems with the WCAC's having disregarded *Runnion* and relied on *Murphy*. First, *Runnion* directly addressed the proper interpretation of MCL 418.331(b) with regard to the issue presented here, while *Murphy* involved an altogether different issue implicating MCL 418.335.[49] Second, and more important, even if *Murphy* had directly addressed the statute and issue presented in this case, the WCAC would not be justified in choosing to follow *Murphy* instead of *Runnion*. The obvious reason for this is the fundamental principle that only this Court has the authority to overrule one of its prior decisions. Until this Court does so, all lower courts and tribunals are bound by that prior decision and must follow it even if they believe that it was wrongly decided or has become obsolete. *Boyd v W G Wade Shows*, 443 Mich 515, 523; 505 NW2d

---

[48] *Runnion, supra* at 24.

[49] *Murphy* concerned the amount of discretion afforded a magistrate by MCL 418.335 to order an employer to continue paying benefits until the dependent turns 18, even though the normal 500-week benefit period has expired. *Murphy, supra* at 596-601. Obviously, this had nothing to do with the proper interpretation of MCL 418.331(b).

27

544 (1993). In short, the WCAC may not, as it has attempted to do here, presume to overrule this Court by disregarding *Runnion* and seeking to impose its own construction of MCL 418.331(b).

Accordingly, should the WCAC determine on remand that Randall Paige's work-related injury was the proximate cause of his death, we direct it to further determine the extent of Adam Paige's dependency on Randall Paige at the time Randall Paige suffered the work-related injury.

## IV. CONCLUSION

We hold that the definition of the phrase "the proximate cause" set forth in *Robinson, supra,* applies to MCL 418.375(2) of the WDCA. In so holding, we overrule *Hagerman, supra*. Accordingly, we vacate the decision of the WCAC and remand this case to the WCAC for a determination of whether Randall Paige's work-related injury was "the proximate cause" of his death under the *Robinson* definition. Furthermore, the WCAC erred in determining that Adam Paige is entitled to a conclusive presumption of whole dependency under MCL 418.331(b). If, on remand, the WCAC determines that Randall Paige's work-related injury was "the proximate cause" of his death, we direct the WCAC to determine the extent of Adam Paige's dependency upon Randall Paige at the time Randall Paige suffered the work-related injury in accordance with *Runnion, supra.*[50]

Clifford W. Taylor
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

---

[50] Our disposition of this case makes consideration of defendant's third issue unnecessary.

28

STATE OF MICHIGAN

SUPREME COURT

RANDALL G. PAIGE (Deceased),

      Plaintiff-Appellee,

v                                                                    No. 127912

CITY OF STERLING HEIGHTS, Self-Insured,

      Defendant-Appellant.

_____

WEAVER, J. (*concurring*).

    I concur in the majority's result and analysis, except part III(B), which is the majority's response to Justice Cavanagh's partial dissent.

                                  Elizabeth A. Weaver

S T A T E   O F   M I C H I G A N

SUPREME COURT

RANDALL G. PAIGE (Deceased),

      Plaintiff-Appellee,

v

No.  127912

CITY OF STERLING HEIGHTS, Self-Insured,

      Defendant-Appellant.

_____

CAVANAGH, J. (*concurring in part and dissenting in part*.)

Today, a majority of this Court vacates the decision of the Workers' Compensation Appellate Commission and remands this case for reconsideration in light of *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000).  In doing so, the majority overrules *Hagerman v Gencorp Automotive*, 457 Mich 720; 579 NW2d 347 (1998).  I firmly believe that *Hagerman* was properly decided and correctly interpreted the phrase "proximate cause" as it is used in MCL 418.375(2).[1]

_____

[1] MCL 418.375(2) provides:

If the injury received by such employee was the proximate cause of his or her death, and the deceased employee leaves dependents, as hereinbefore specified, wholly or partially dependent on him or her for support, the death benefit shall be a sum sufficient, when added to the indemnity which at the time of death has been paid or becomes payable under the provisions of this act to the deceased employee, to make the total compensation for the injury and death exclusive of medical, surgical, hospital services, medicines, and rehabilitation services, and expenses furnished as provided in sections 315 and 319, equal to the full amount which such dependents would have been entitled to receive under the provisions of section 321, in case the injury had resulted in

(continued…)

Specifically, this Court correctly considered and rejected the interpretation adopted today; namely, use of the article "the" before the term "proximate cause" does not compel the conclusion that the phrase means sole cause. *Hagerman*, *supra* at 728-729. Further, this Court wisely reasoned that the interpretation adopted today would not only ignore the text of the statute, it would also be inconsistent with concurrent causation principles predating the enactment of MCL 418.375(2). *Hagerman, supra* at 729-734. Indeed, a sole proximate cause requirement would contradict the law's longstanding recognition that there may be more than one proximate cause, and there is no evidence that the Legislature intended to deviate from this principle in MCL 418.375(2). Therefore, *Hagerman* correctly held that the current majority's interpretation of MCL 418.375(2) has neither textual nor historical support. Instead, *Hagerman* held that death is within the range of compensable consequences if the injury was a substantial factor in the death, and such a determination will almost always depend on the facts presented in a given case. *Hagerman, supra* at 736. Accordingly, I must respectfully dissent from today's decision.

Despite my disagreement with the majority's interpretation of MCL 418.375(2) and its election to overrule *Hagerman*, I agree with the majority that the presumption of whole dependency applies if the child was less than 16 years old at

---

(…continued)
immediate death. Such benefits shall be payable in the same manner as they would be payable under the provisions of section 321 had the injury resulted in immediate death.

the time of the employee's death. MCL 418.331(b); *Runnion v Speidel*, 270 Mich 18; 257 NW 926 (1934).

I could take this opportunity to further explain why *Hagerman* was correctly decided and should not be overruled. Specifically, I could dissect *Hagerman* and explain why a decision from this Court issued just eight years ago and examining the very same issue that is implicated in this case is now being improperly overruled. Further, similarly to how the majority crafts its opinion in this case, I suppose I could simply cut and paste the relevant portions of the *Hagerman* majority opinion in support of my view that *Hagerman* remains good law. Additionally, like the current majority does, I could quote at length from the dissents in *Robinson* to show why *Hagerman* was properly decided. But I believe that my views on this issue are well-documented, as are the majority's views. Accordingly, such an approach would not add much, if any, value to our jurisprudence. In other words, simply rehashing the same differences of opinion that this Court detailed just eight and six years ago does not benefit the bench and bar in any meaningful way. And more importantly, this regurgitation process would still not truly answer the question at hand: Why is a decision of this Court issued just eight years earlier and involving the same issue now being overruled?

Unfortunately, today's majority does not adequately answer that question. Instead, it is clear from today's decision, as well as from *Robinson* and its progeny, that the current majority does not like *Hagerman*. But mere disagreement with a validly issued opinion of this Court has never served as a legitimate basis for

3

overruling precedent. Something more has always been required. *Robinson*, *supra* at 464-465. And the generic justifications the majority provides do not satisfy the standard it set forth in *Robinson* for overruling precedent.[2] Instead, the majority devotes considerable effort in explaining why it believes the *Hagerman* decision was wrong and in personally attacking me, but little attention is paid to carefully explaining why *Hagerman* defies practical workability, whether reliance interests on *Hagerman* weigh against overruling it, and whether there has been some legal or factual change that no longer makes *Hagerman* justifiable. See *Robinson*, *supra* at 464-466. This is both telling and troubling.

Under *Robinson*, before this Court can overrule established precedent, this Court must first decide whether the earlier decision was wrong. For the reasons stated earlier in this dissent, I believe that *Hagerman* was correctly decided. Nonetheless, the current majority disagrees. I must note, however, that apart from recycling *Robinson* and the *Hagerman* dissent, the majority does not set forth any new reasons why *Hagerman* was wrongly decided other than those that were expressly rejected in *Hagerman*. The majority is certainly permitted to reargue the merits of the *Hagerman* dissent in support of its conclusion that *Hagerman* was wrongly decided. And there is little doubt that the majority is entitled to its view.

---

[2] In *Robinson*, this Court observed that before established precedent is overruled, this Court must first decide whether (1) the earlier case was wrongly decided, (2) the earlier case defies practical workability, (3) reliance interests would work an undue hardship if the earlier case was overruled, and (4) changes in the law or facts no longer justify the earlier decision. *Robinson*, *supra* at 464-465; see also *Pohutski v City of Allen Park*, 465 Mich 675, 694; 641 NW2d 219 (2002).

But again, under the doctrine of stare decisis and *Robinson*, merely believing that *Hagerman* was wrongly decided is an insufficient ground to overrule that decision. Other considerations must factor into the calculus. And in light of these other considerations, the majority has simply failed to satisfy the standard for overruling precedent. Therefore, regardless of whether this Court believes that *Hagerman* was correctly decided—like I do—or wrongly decided—like the majority does—the doctrine of stare decisis prevents this Court from overruling *Hagerman* at this time.

For example, before this Court can overrule established precedent, this Court must also decide whether, apart from being wrongly decided, the earlier case defies practical workability. Here, the majority has not specifically demonstrated that *Hagerman* defies practical workability. Instead, the majority posits that *Hagerman* is unworkable because the majority believes *Hagerman* is inconsistent with the language of the statute. According to the majority, *Hagerman* is unworkable because a reader and a follower of the statute would not be behaving in accordance with the law because *Hagerman* rewrote MCL 418.375(2). But the majority's rationale with respect to *Hagerman's* workability really goes back to the majority's belief that *Hagerman* was wrongly decided. Indeed, the majority has not demonstrated that injured employees, insurers, magistrates, or the Workers' Compensation Appellate Commission—the primary readers and followers of the statute—have found *Hagerman's* interpretation to be unworkable. Indeed, in this case, neither the magistrate nor the Workers' Compensation Appellate Commission had any difficulty in applying *Hagerman* and concluding, on the basis of medical testimony, that the

5

earlier heart attack proximately caused the death. Further, the majority's logic also ignores the notion that *Hagerman's* interpretation was, in fact, the rule of law, and that the Legislature did not amend the statute because it believed *Hagerman* proved to be unworkable. Therefore, because the majority's rationale regarding *Hagerman's* workability relates solely to its belief that *Hagerman* was wrongly decided, the majority has not satisfied the standard set forth in *Robinson* for overruling precedent.

Under *Robinson*, this Court must also consider whether reliance interests would be misplaced and cause an undue hardship if established precedent was overruled. Here, the majority's rationale regarding reliance interests is simply unpersuasive and does not satisfy the standard set forth in *Robinson*. The majority tells us that no reliance interests would be disturbed because injured workers, Randall Paige, and his counsel could not have feasibly relied on *Hagerman*, the controlling law at the time of this action. Such an assertion is preposterous because it suggests that injured workers and attorneys who practice in the area of workers' compensation do not, and should not, rely on this Court's interpretation of the Worker's Disability Compensation Act, MCL 418.101 *et seq*. Moreover, such logic is inconsistent with the majority's attempted rationale regarding *Hagerman's* workability. Here, the majority attempts to claim that *Hagerman* is unworkable because people have a right to rely on the law; however, in its next breath, the majority posits that no reliance interest would be unsettled because people do not actually rely on the law.

Further, the majority also attempts to set forth a rather curious position lacking any legal foundation that "mere *compliance* with precedent" will never amount to a

6

reliance interest. Rather, the majority posits that reliance interests are only considered where a "large number of persons," "an entire class of individuals," or "a great number of people" "attempt to conform their conduct to a certain norm." *Ante* at 14-15. But the majority does not provide any standard for what is a "large number of persons," "an entire class," or "a great number of people." Moreover, the majority theorizes that "mere *compliance* with precedent" is insufficient to affect reliance interests; rather, only where "a great number of people affirmatively alter their behavior" will reliance interests be considered. *Ante* at 15 (emphasis in original). Yet the majority does not provide any guidance on what it is that distinguishes "mere *compliance*" from "affirmatively altering . . . behavior." Nor does the majority explain *why* this distinction must pertain when this Court must decide whether to overrule precedent. Instead, the majority offers a standardless, arbitrary theory that lacks any principled legal basis. Because such a theory poses a serious threat to the jurisprudence of this Court, completely guts the test set forth by the majority in *Robinson* for overruling precedent, and invites abuse, such a theory is fundamentally flawed.

Worse still, the majority claims that no reliance interests would be unsettled because injured employees do not script their injuries and illnesses on the basis of the opinions of this Court. But such a claim is insulting to those who happen to be injured on the job, and it demonstrates that the majority's rationale regarding the reliance placed on *Hagerman* starts from a faulty premise. Granted, workers do not choose to become injured or sick on the basis of the decisions of this Court. Getting

7

hurt or sick is often not a choice; workers simply get injured or sick. But when a worker suffers an injury or illness arising out of and in the course of employment, that worker and his counsel then rightfully rely on the rule of law when deciding how to protect and pursue the worker's rights. And the rule of law applicable at the time the worker in this case died was *Hagerman*. As a validly issued decision of this Court, *Hagerman* was the controlling law in this state. And a validly issued decision from this Court is only rendered "untenable" when it is properly overruled by this Court. Accordingly, *Hagerman's* status was not precarious because *Robinson* did not expressly or implicitly overrule *Hagerman*.[3] Therefore, the majority's rationale regarding the reliance interests placed on *Hagerman* does not satisfy the standard it set forth in *Robinson*.

Finally, before this Court can overrule established precedent, this Court must also decide whether changes in the law or facts no longer justify the earlier decision. Here, the majority simply concludes:

> [W]e need not consider whether changes in the law and facts no longer justify *Hagerman* because *Hagerman* itself was never justified

---

[3] In any event, *Hagerman* was allegedly rendered "untenable" and "inconsistent" by design. The author of the *Hagerman* dissent was given the opportunity to examine an arguably similar issue and pen *Robinson*. In doing so, the author relied on his *Hagerman* dissent. Still, *Hagerman* was not expressly or impliedly overruled. Yet the seed was planted, the instant defendant seized this opportunity, and the author of the *Hagerman* dissent has now been granted his wish. Under these circumstances, it cannot honestly be said that this case falls within the class of cases where it is this Court's duty to reexamine precedent ""where its reasoning . . . is *fairly* called into question."" *Sington v Chrysler Corp*, 467 Mich 144, 161; 648 NW2d 624 (2002) (emphasis added; citations omitted). Rather, it was reasonable for the readers and followers of MCL 418.375(2) to rely on *Hagerman* until properly overruled.

> as it was a change in the law that this Court had the power, but not the authority, to make. It was not justified from its inception. [*Ante* at 16.]

Clearly, such an assertion completely ignores the standard for overruling precedent set forth in *Robinson*. And importantly, the majority's rationale in this statement again reveals its belief that it can properly overrule *Hagerman* simply because it believes that *Hagerman* was wrongly decided. In other words, the majority does not feel the need to point to any special justification or change to support its election to overrule *Hagerman*. Perhaps that is because there has been no change in the law or the workers' compensation landscape in the eight years since *Hagerman* was decided. The only change has been the composition of this Court. And unfortunately, this is the only reasonable answer to the question why a decision from this Court decided just eight years earlier and involving the same issue is now being overruled. But make no mistake, this answer is alarming, and it has become increasingly common. See, e.g., *Devillers v Auto Club Ins Ass'n*, 473 Mich 562; 702 NW2d 539 (2005).

Granted, it is said that stare decisis is not "'an inexorable command.'" *Robinson*, *supra* at 464 (citation omitted). And under some circumstances, overruling precedent may be unavoidably necessary. But "this Court has consistently opined that, *absent the rarest circumstances*, we should remain faithful to established precedent." *Brown v Manistee Co Rd Comm*, 452 Mich 354, 365; 550 NW2d 215 (1996) (emphasis added). Moreover, this Court "'will not overrule a decision deliberately made unless [it] is convinced not merely that the case was wrongly decided, but also that less injury would result from overruling than from following

9

it.'" *Id.* (citation omitted). Thus, stare decisis is "'the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.'" *Robinson*, *supra* at 463 (citation omitted).[4] Here, overruling *Hagerman* does not advance any of these principles. In fact, just the opposite is true.

Again, the reasons the majority advances in support of overruling *Hagerman* are simply unpersuasive. As noted earlier, the current majority offers no *new* reasons why *Hagerman* was wrongly decided other than those duly considered and

---

[4] In its response to this dissent, the majority includes a citation to a text written by Chief Justice William H. Rehnquist. However, the majority would be well-advised to read more of the late chief justice's jurisprudence, particularly his views on the doctrine of stare decisis. For example, it is no surprise that Chief Justice Rehnquist was highly critical of the constitutional rule announced in *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). See, e.g., *Michigan v Jackson*, 475 US 625, 637-642; 106 S Ct 1404; 89 L Ed 2d 631 (1986) (Rehnquist, J., dissenting). But Chief Justice Rehnquist was also the author of the Court's decision that later reaffirmed *Miranda*. *Dickerson v United States*, 530 US 428; 120 S Ct 2326; 147 L Ed 2d 405 (2000). In *Dickerson*, Chief Justice Rehnquist wrote:

> Whether or not we would agree with *Miranda's* reasoning and its resulting rule, were we addressing the issue in the first instance, the principles of *stare decisis* weigh heavily against overruling it now. While "'*stare decisis* is not an inexorable command,'" particularly when we are interpreting the Constitution, "even in constitutional cases, the doctrine carries such persuasive force that we have always required a departure from precedent to be supported by some 'special justification.'" [*Id.* at 443 (citations omitted).]

As explained more fully earlier in this dissent, the majority in this case offers no "special justification" for overruling *Hagerman* other than its belief that it was wrongly decided. Therefore, the majority's approach in this case appears inconsistent with the late chief justice's views.

reasonably rejected in *Hagerman*.[5]  So it cannot be said that overruling *Hagerman* contributes to the development of the law.  Rather, overruling *Hagerman* in the manner employed today signals that any decision from this Court depends on and is only as strong as the Court's composition.  When those justices who were once in the minority find themselves in the majority, today's decision gives those justices free license to vindicate their dissents and disregard the doctrine of stare decisis.  There is nothing evenhanded or predictable in this approach.  Nothing in such an approach fosters reliance on this Court's decisions.  And certainly such actions destroy the actual and perceived integrity of this Court.  This Court—including its past, current, and future members—and the rule of law are entitled to more respect.  The mere dislike of some justices on this Court of decisions rendered by justices who previously sat in their chairs does not constitute a sufficient ground under the law to disregard and overrule those past decisions.

Let me be perfectly clear.  This dissent cannot properly be characterized as "sour grapes" simply because I believe that *Hagerman* was correctly decided and, importantly, should not be overruled.  If that were true, I would be guilty of roughly the same sin as the majority.  Nor can this dissent be appropriately labeled as an

---

[5] The only new "analysis" set forth by the current majority involves its disapproval of what it considers so-called "preferential rules of construction." *Ante* at 12-13.  But I disagree with the views expressed in this discussion.  In any event, the majority's discussion of these "preferential rules of construction" does not even come close to establishing a legitimate, independent reason to overrule *Hagerman*.

expression of how I would *prefer* MCL 418.375(2) to be interpreted. Even a casual reading of *Hagerman* refutes such a charge.[6]

Instead, this dissent is intended to highlight the rather unremarkable principle that this Court and the laws of this state are larger than any individual justice, justices, or "philosophy." This dissent is also intended to urge the majority to follow the doctrine of stare decisis, a fundamental principle of our law. Further, this dissent is intended to observe that the doctrine of stare decisis is particularly strong in matters of statutory interpretation, like *Hagerman*, because if this Court previously interpreted a statute incorrectly, the Legislature can subsequently remedy that interpretation and fix the statute, which it has not done in this case. Moreover, this dissent is intended as a reminder that adherence to stare decisis in matters of statutory interpretation where the Legislature has not corrected the interpretation respects principles of separation of powers, is consistent with the "judicial role," and avoids arbitrariness. Finally, this dissent is intended to highlight the principle that the rule of law also includes this Court's precedent. Sadly, these principles remain a mystery to the current Court, and the underlying debate involving these principles has been going on for some time. See, e.g., *Robertson v DaimlerChrysler*, 465 Mich 732; 641 NW2d 567 (2002).

Nonetheless, the majority completely misses the point of this dissent. Rather than adequately explaining why stare decisis is being ignored in this case—the point

---

[6] Interestingly, similar unfounded accusations were lodged by the *Hagerman* dissent and prudently rejected by the *Hagerman* majority. See *Hagerman*, *supra* at

(continued…)

12

raised by this dissent—the majority seeks to blur what this case is truly about. In doing so, the majority confuses the legal issues and simultaneously attempts to silence those who disagree. But once the histrionics are peeled away, the pretense of the majority's decision in this particular case is evident.

For example, the majority speaks of consistency and predictability. But again, the majority does not adequately explain why it disregards the doctrine of stare decisis—*a doctrine that is fundamentally based on consistency and predictability*. Accordingly, what the majority professes to be a basis for its "philosophy" is at odds with what the majority is actually doing in this particular case. Moreover, the majority speaks of constitutional usurpation and separation of powers. But again, the majority does not adequately explain why it disregards the doctrine of stare decisis in a matter of statutory interpretation when the Legislature itself has not seen fit in eight years to correct *Hagerman's* allegedly incorrect interpretation. Therefore, the majority's rhetoric concerning public policy is at odds with what the majority is actually doing in this particular case—*making a policy choice for the Legislature and the people*.[7]

In matters of stare decisis, Justice Black summed up his own views on the issue in his dissent in *Boys Markets, Inc v Retail Clerks Union, Local 770*, 398 US

---

(…continued)
734 n 12.

[7] See, e.g., *Douglass v Pike Co*, 101 US 677, 687; 25 L Ed 968 (1879) ("After a statute has been settled by judicial construction, the construction becomes, so far as contract rights acquired under it are concerned, as much a part of the statute as the

(continued…)

13

235, 257-258; 90 S Ct 1583; 26 L Ed 2d 199 (1970). And while it is unnecessary to adopt Justice Black's views for Michigan law, his views, and the underlying principles, are at least worthy of consideration. Justice Black observed:

> In the ordinary case, considerations of certainty and the equal treatment of similarly situated litigants will provide a strong incentive to adhere to precedent.
>
> When this Court is interpreting a statute, however, an additional factor must be weighed in the balance. It is the deference that this Court owes to the primary responsibility of the legislature in the making of laws. Of course, when this Court first interprets a statute, then the statute becomes what this Court has said it is. Such an initial interpretation is proper, and unavoidable, in any system in which courts have the task of applying general statutes in a multitude of situations. The Court undertakes the task of interpretation, however, not because the Court has any special ability to fathom the intent of Congress, but rather because interpretation is unavoidable in the decision of the case before it. When the law has been settled by an earlier case then any subsequent "reinterpretation" of the statute is gratuitous and neither more nor less than an amendment: it is no different in effect from a judicial alteration of language that Congress itself placed in the statute.
>
> Altering the important provisions of a statute is a legislative function. And the Constitution states simply and unequivocally: "All legislative Powers herein granted shall be vested in a Congress of the United States . . . ." It is the Congress, not this Court, that responds to the pressures of political groups, pressures entirely proper in a free society . . . . This Court should, therefore, interject itself as little as possible into the law-making and law-changing process. Having given our view on the meaning of a statute, our task is concluded, *absent extraordinary circumstances*. When the Court changes its mind years later, simply because the judges have changed, in my judgment, it takes upon itself the function of the legislature. [*Id*. at 257-258 (Black, J., dissenting) (emphasis added; citations omitted).][8]

---

(…continued)

text itself, and a change of decision is to all intents and purposes the same in its effect on contracts as an amendment of the law by means of a legislative enactment." ).

[8] Remarkably, the majority proclaims that Justice Black's views are "no authority at all" and, thus, his views need not even be considered in this debate. *Ante*

(continued…)

at 21. Accordingly, the majority tries mightily to ignore Justice Black's view that overruling precedent that previously interpreted a statute always amounts to a violation of separation of powers. Presumably this is because those in the majority believe that a separation of powers argument is uniquely theirs to make. But the majority's attempts to discount Justice Black's views are flawed. For example, the majority claims that Justice Black's view may be consistent with the United States Constitution's separation of powers principles but not our own. Yet the majority does not explain how the fundamental principle embodied in the United States Constitution practically differs from Michigan's: "the doctrine of separation of powers . . . is set forth in Const 1963, art 3, § 2, which provides that '[t]he powers of government are divided into three branches: legislative, executive and judicial," and further provides that "[n]o person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.'" *Warda v Flushing City Council*, 472 Mich 326, 334 n 4; 696 NW2d 671 (2005). Additionally, the majority claims that Justice Black's view may be applicable in the United States Supreme Court given the peculiar nature of "that Court's need to devote itself primarily to constitutional adjudications." *Ante* at 21 n 35. However, contrary to the majority's understanding, the United States Supreme Court's jurisdiction is not so limited:

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects. [US Const, Art III, § 2.]

See also Scalia, *A Matter of Interpretation: Federal Courts and the Law* (New Jersey: Princeton University Press, 1997), pp 13-14 ("[a] very small proportion of judges' work is constitutional interpretation in any event. (Even in the Supreme Court, I would estimate that well less than a fifth of the issues we confront are constitutional issues—and probably less than a twentieth if you exclude criminal-law cases.) By far the greatest part of what I and all federal judges do is interpret the meaning of federal statutes and federal agency regulations.").

Further, the majority claims that Justice Black's view may pertain to the United States Supreme Court, but not state supreme courts, because the United States Supreme Court's workload is daunting because that Court accepts appeals from many lower courts under its jurisdiction. But such an assertion ignores the reality that state

Yet in light of the points raised by this dissent, at its basic core, the majority nevertheless tells the people of this state that its "philosophy" and "preferences" should control the outcome of a given case. But the rule of law and the facts of the case should control the outcome, not any "philosophy." In matters of statutory interpretation, I have never wavered from the principle that a plain and unambiguous statute is to be applied as written. Under some circumstances, however, a statute may be unclear or ambiguous, which is likely to happen in cases reaching the highest Court in this state. As such, when a statute is unclear, then well-established, centuries-old rules of construction often come into play and may help this Court resolve the controversy and determine the Legislature's intent.

---

(…continued)
supreme courts, including the Michigan Supreme Court, also accept appeals from the lower courts under their jurisdiction. Additionally and, frankly, comically, the majority attempts to discount Justice Black's views simply because he voiced them in a dissent and the majority in that case rejected his views. But in the very case before this Court, the majority uses the *Hagerman* dissent as its primary authority for concluding that *Hagerman* was wrongly decided and, therefore, must be overruled.

Finally, the majority attempts to argue that Justice Black's view is not defensible under the Michigan Constitution because our Constitution forbids a court from exercising legislative power. Accordingly, the majority protests and simplistically asserts that it cannot amend statutes. But this is the very point Justice Black was attempting to make, and apparently this point is lost on the majority. Justice Black posits that any "reinterpretation" of a settled statute is effectively an amendment. And because "we cannot 'amend' statutes," Justice Black asserts that doing so would violate principles of separation of powers. *Ante* at 21. Again, it is not necessary to adopt Justice Black's view for Michigan's jurisprudence, and I am not advocating that we do so now. I do believe, however, that a Court that consistently preaches the importance of separation of powers should at least consider the thoughtful points raised on this very issue by a United States Supreme Court justice.

16

Accordingly, I encourage readers to examine the sampling of cases that the majority sets forth and judge my fidelity for themselves. See *ante* at 18-19 ns 26-29. For example, sometimes a statute is plain and unambiguous; therefore, the judge applies the statute as written. *People v Barbee*, 470 Mich 283; 681 NW2d 348 (2004); *Title Office, Inc v Van Buren Co Treasurer*, 469 Mich 516; 676 NW2d 207 (2004); *Stanton v City of Battle Creek*, 466 Mich 611; 647 NW2d 508 (2002); *People v Stone*, 463 Mich 558; 621 NW2d 702 (2001); *In re MCI Telecom Complaint*, 460 Mich 396; 596 NW2d 164 (1999); *In re Wirsing*, 456 Mich 467; 573 NW2d 51 (1998). Other times a statute may be ambiguous or unclear, and judicial construction then becomes necessary and the judge must "jump the textualist rails." See, e.g., *Lansing Mayor v Public Service Comm,* 470 Mich 154, 174; 680 NW2d 840 (2004) (Cavanagh, J., dissenting) ("I, on the other hand, believe that the statute is ambiguous and turn to legislative history accompanying the statute to discern the Legislature's true intent."). And other times principles of stare decisis in matters of statutory interpretation, particularly where the Legislature has not responded to a prior interpretation, weigh against overruling precedent absent sound and specific justification. See, e.g., *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 613-614; 702 NW2d 539 (2005) (Cavanagh, J., dissenting); *Neal v Wilkes*, 470 Mich 661, 676-677; 685 NW2d 648 (2004) (Cavanagh, J., dissenting); *People v Moore,* 470 Mich 56, 78-79; 679 NW2d 41 (2004) (Cavanagh, J., dissenting); *Jones v Dep't of Corrections,* 468 Mich 646, 665; 664 NW2d 717 (2003) (Cavanagh, J., dissenting); *Mack v Detroit,* 467 Mich 186, 221-222; 649 NW2d 47 (2002) (Cavanagh, J., dissenting);

17

*Robertson*, *supra* at 767-768 (Cavanagh, J., dissenting). Thus, I fail to see how these universally accepted legal principles are unsound, unpredictable, or unprincipled. Rather, I believe that the rule of law and the facts of the case should control the outcome, not ideology or "philosophy." And if the majority wishes to characterize this in itself as a "philosophy" or "methodology," so be it. But as the majority's own rhetoric in this case shows, labels can be dangerous and are often misleading.

I have no doubt that the majority firmly believes that it dispenses justice and that its "philosophy" is the best means to this end and best serves the people of this state. But far too often the majority merely pays lip service to its stated "philosophy" or entirely misapplies it. For example, in cases involving issues of statutory interpretation, the majority and I often disagree whether a particular statute is ambiguous. But because there are two sound, reasonable interpretations based on the statutory language, this should signal that the statute may not be as clear as the majority purports it to be. See, e.g., *Yellow Freight System, Inc v Michigan*, 464 Mich 21; 627 NW2d 236 (2001), rev'd 537 US 36 (2002), vacated and remanded 468 Mich 862 (2003), on remand 257 Mich App 602; 669 NW2d 553 (2003). In any event, because it claims to abhor most well-accepted rules of statutory construction, the majority nonetheless is reluctant in some cases to find ambiguity or conclude that something is unclear. *But no judge should ignore ambiguity when it is present merely to reach a given result, just as no judge should manufacture ambiguity.* [9]

---

[9] For example, in *Twichel v MIC Gen Ins Corp*, 469 Mich 524; 676 NW2d 616 (2004), cited by the majority in this case, the current majority and the dissenters

(continued…)

18

Nonetheless, when in cases of statutory interpretation there is a basic, reasonable difference of opinion about whether language is ambiguous, the majority's standard procedure is to vehemently claim a statute is plain and unambiguous, resort to numerous dictionary definitions, and accuse the dissenters and past justices of this Court of legislating from the bench, usurping the role of the Legislature, advancing their own policy preferences, or some combination of these accusations. This approach destroys the public's confidence in this Court.

This case is a perfect example. The majority chooses to criticize me rather than respond and adequately explain why *Hagerman* must be overruled under accepted principles of stare decisis. In turn, this case has become less about stare decisis and respect for precedent and more about giving the majority another opportunity to extol the virtues of its "philosophy" while simultaneously disregarding the principles that supposedly support its "philosophy," as well as attacking those

_____

(…continued)
disagreed over whether the term "owner" as used in a particular insurance policy was ambiguous. After selectively consulting numerous dictionary definitions, the *Twichel* majority opined that "possession, control, and dominion are among the primary features of ownership." *Id*. at 534 (emphasis deleted). Relying on these "primary features," the current majority opined that the term "owner" was plain and, therefore, concluded that the person who died in that case was not entitled to benefits. On the other hand, the dissenters concluded that ownership may entail more than possession, dominion, and control. Rather unremarkably, the dissenters reasoned that "owner" may also mean the person "'who has the legal or rightful title, whether he is the possessor or not.'" *Id*. at 537 (citation omitted) (Cavanagh, J., dissenting). Accordingly, the majority's citation of *Twichel*, and other similar cases, is illuminating because, as the majority rightfully suggests, it clearly shows the differences between the current majority's and the dissent's views on ambiguity, as well as standard rules of judicial construction.

who disagree. This blurs what this case is really about: *stare decisis and respect for precedent*.

Further, I have no doubt that the majority truly believes that it is fixing what it perceives to be a wrong in this case. However, I believe that *Hagerman* was properly decided. Nonetheless, my disagreement on that point is not really the main thrust of this dissent. Rather, this dissent is intended to observe that there are larger issues at stake in this case: the rule of law, respect for precedent, the integrity of this Court, and judicial restraint. Accordingly, larger institutional issues are implicated in this case.

This case, like all cases that come before this Court, should be about the rule of law, not ideology or partisanship. The cases this Court decides are not some sort of game or political football, complete with "regime[s]," "influence," and "winner[s]." *Ante* at 24. Further, this Court must always be mindful that our decisions have real implications and affect real people. This Court must also be mindful that attacking sitting colleagues who happen to disagree, as well as attacking past justices—who cannot defend themselves—and characterizing them as inferior, "unpredictable," and "inconsistent," does an extreme disservice to this Court and the citizens of this state. *Ante* at 24. Such attacks are disrespectful. Such attacks are not robust legal debate by any definition. And such attacks and rhetoric wound this Court as an institution.

Nonetheless, far too often, the members of the current majority prefer to attack and spin. Far too often, the members of the current majority use terms such as

20

"textualism," "judicial role," "usurpation," "separation of powers," and "policy preferences" when conducting damage control and to mask the rationale of some of its opinions, not to mention the results of some of its opinions. When this occurs, members of this Court must voice their disagreement. And far too often, the majority will then elect to ignore the legal merits of any disagreement and, instead, choose to criticize the person who happens to disagree. But the majority is quite right that history, not me, will ultimately pass judgment on the current Court's fidelity and jurisprudence.[10] Indeed, long after those in the current majority are gone, their decisions will remain. And I am sure it is their hope that when future members of this Court consider their body of work, those future justices will exercise more respect, wisdom, and restraint than the current majority has shown today.

Michael F. Cavanagh
Marilyn Kelly

---

[10] Likewise, I will leave it to history and others to evaluate my record as well. Thus, I see no need to "rebut" the majority's compilation in *Sington, supra,* or Victor E. Schwartz's article in a recent Michigan Bar Journal, *A critical look at the jurisprudence of the Michigan Supreme Court*, 85 Mich B J 38 (January, 2006). I must note, however, that Mr. Schwartz is a renowned "tort-reform" advocate, and filed an amicus brief in support of the result reached by the majority in *Henry v Dow Chemical Co*, 473 Mich 63; 701 NW2d 684 (2005). I must also note that Mr. Schwartz's article was part of a point-counterpoint discussion. Thus, I encourage readers to also explore Professor Miller's companion piece (*Judicial Politics: Restoring the Michigan Supreme Court*) disagreeing with Mr. Schwartz's characterization, as well as the countless letters to the editors passionately disagreeing with Mr. Schwartz's description of this Court that have appeared in subsequent issues of the bar journal. See 85 Mich B J 10-12 (March, 2006); 85 Mich B J 14 (May, 2006).